## SHAPIRO *v.* UNITED STATES.

No. 49.   Argued October 23, 1947.—Decided June 21, 1948.

2

*Bernard Tomson* argued the cause for petitioner. With him on the brief were *Menahem Stim* and *Michael C. Bernstein.*

*Solicitor General Perlman* argued the cause for the United States. With him on the brief were *Assistant Attorney General Quinn, Philip Elman, Robert S. Erdahl* and *Irving S. Shapiro.*

Mr. Chief Justice Vinson delivered the opinion of the Court.

Petitioner was tried on charges of having made tie-in sales in violation of regulations under the Emergency Price Control Act.[1] A plea in bar, claiming immunity from prosecution based on § 202 (g) [2] of the Act, was

---

[1] 56 Stat. 23, as amended, 50 U. S. C. App. § 901.

[2] "No person shall be excused from complying with any requirements under this section because of his privilege against self-incrimination, but the immunity provisions of the Compulsory Testimony Act of February 11, 1893 (U. S. C., 1934 edition, title 49, sec. 46), shall apply with respect to any individual who specifically claims such privilege." 50 U. S. C. App. § 922 (g).

The Compulsory Testimony Act of 1893 provides: "No person shall be excused from attending and testifying or from producing

4

overruled by the trial judge; judgment of conviction followed and was affirmed on appeal.   159 F. 2d 890.   A contrary conclusion was reached by the district judge in *United States* v. *Hoffman, post,* p. 77.   Because this conflict involves an important question of statutory construction, these cases were brought here and heard together. Additional minor considerations involved in the *Hoffman* case are dealt with in a separate opinion.

The petitioner, a wholesaler of fruit and produce, on September 29, 1944, was served with a subpoena *duces tecum* and *ad testificandum,* issued by the Price Administrator under authority of the Emergency Price Control Act.   The subpoena directed petitioner to appear before designated enforcement attorneys of the Office of Price Administration and to produce "all duplicate sales invoices, sales books, ledgers, inventory records, contracts and records relating to the sale of all commodities from September 1, 1944 to September 28, 1944."   In compliance with the subpoena, petitioner appeared and, after being sworn, was requested to turn over the subpoenaed records.   Petitioner's counsel inquired whether petitioner was being granted immunity "as to any and all matters for information obtained as a result of the investigation and examination of these records."   The presiding official stated that the "witness is entitled to whatever immunity which flows as a matter of law from the production of these books and records which are required to be kept

books, papers, tariffs, contracts, agreements and documents before the Interstate Commerce Commission, or in obedience to the subpoena of the Commission . . . on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him, may tend to criminate him or subject him to a penalty or forfeiture. But no person shall be prosecuted or subject to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise, before said Commission, or in obedience to its subpoena . . . ."

pursuant to MPRs 271 and 426." [3]  Petitioner thereupon produced the records, but claimed constitutional privilege.

The plea in bar alleged that the name of the purchaser in the transactions involved in the information appeared in the subpoenaed sales invoices and other similar documents.   And it was alleged that the Office of Price Administration had used the name and other unspecified leads obtained from these documents to search out evidence of the violations, which had occurred in the preceding year.

The Circuit Court of Appeals ruled that the records which petitioner was compelled to produce were records required to be kept by a valid regulation under the Price Control Act; that thereby they became public documents, as to which no constitutional privilege against self-incrimination attaches; that accordingly the immunity of § 202 (g) did not extend to the production of these records and the plea in bar was properly overruled by the trial court.    159 F. 2d 890.

It should be observed at the outset that the decision in the instant case turns on the construction of a com-

---

[3] Section 14 of Maximum Price Regulation 426, 8 Fed. Reg. 9546, 9548–49 (1943) provides:

"*Records.* (a) Every person subject to this regulation shall, so long as the Emergency Price Control Act of 1942, as amended, remains in effect, preserve for examination by the Office of Price Administration all his records, including invoices, sales tickets, cash receipts, or other written evidences of sale or delivery which relate to the prices charged pursuant to the provisions of this regulation.

"(b) Every person subject to this regulation shall keep and make available for examination by the Office of Price Administration for so long as the Emergency Price Control Act of 1942, as amended, remains in effect, records of the same kind as he has customarily kept, relating to the prices which he charges for fresh fruits and vegetables after the effective date of this regulation and in addition as precisely as possible, the basis upon which he determined maximum prices for these commodities."

6

pulsory testimony-immunity provision which incorporates by reference the Compulsory Testimony Act of 1893. This provision, in conjunction with broad record-keeping requirements, has been included not merely in a temporary wartime measure but also, in substantially the same terms, in virtually all of the major regulatory enactments of the Federal Government.[4]

---

[4] Some of the statutes which include such provisions, applicable to the records of non-corporate as well as corporate business enterprises, are listed below:

Shipping Act, 1916 [46 U. S. C. §§ 826, 827, 814, 817, 820].

Packers and Stockyards Act, 1921 [7 U. S. C. §§ 221, 222].

Commodity Exchange Act of 1922 [7 U. S. C. §§ 15, 6, 7a].

Perishable Agricultural Commodities Act, 1930 [7 U. S. C. § 499m, 499i].

Communications Act of 1934 [47 U. S. C. §§ 409, 203, 211, 213 (f), 220, 412].

Securities Exchange Act of 1934 [15 U. S. C. §§ 78q, 78u].

Federal Alcohol Administration Act, 1935 [27 U. S. C. §§ 202 (c), 204 (d); 26 U. S. C. § 2857; 15 U. S. C. §§ 49, 50].

Federal Power Act, 1935 [16 U. S. C. §§ 825 (a), 825f (g)].

Industrial Alcohol Act of 1935 [26 U. S. C. §§ 3119, 3121 (c)].

Motor Carrier Act of 1935 [49 U. S. C. §§ 305 (d), 304 (a) (1), 311 (d), 317, 318, 320, 322 (g)].

National Labor Relations Act, 1935 [29 U. S. C. §§ 156, 161].

Social Security Act, 1935 [42 U. S. C. § 405 (a), (d), (e), (f)].

Merchant Marine Act, 1936 [46 U. S. C. §§ 1124, 1211, 1114 (b)].

Bituminous Coal Act of 1937 [15 U. S. C. (1940 ed.) §§ 838, 833 (a), (e); (k), 840 (terminated, as provided in § 849)].

Civil Aeronautics Act of 1938 [49 U. S. C. §§ 644, 483, 487, 492, 622 (e) and (g), 673].

Fair Labor Standards Act of 1938 [29 U. S. C. §§ 209, 211; 15 U. S. C. §§ 49, 50].

Natural Gas Act, 1938 [15 U. S. C. § 717a, g, m].

Railroad Unemployment Insurance Act, 1938 [45 U. S. C. §§ 362 (a), (b), (c), (l), 359].

Water Carriers Act of 1940 [49 U. S. C. §§ 916, 906, 913, 917 (d)].

Freight Forwarders Act, 1942 [49 U. S. C. §§ 1017 (a), (b), (d), 1005, 1012, 1021 (d)].

In addition to the Price Control Act, the other major regulatory

It is contended that a broader construction of the scope of the immunity provision than that approved by the Circuit Court of Appeals would be more consistent with the congressional aim, in conferring investigatory powers upon the Administrator, to secure prompt disclosure of books and records of the private enterprises subjected to OPA regulations. In support of this contention, it is urged that the language and legislative history of the Act indicate nothing more than that § 202 was included for the purpose of "obtaining information" and that nothing in that history throws any light upon the scope of the immunity afforded by subsection (g). We cannot agree with these contentions. For, the language of the statute and its legislative history, viewed against the background of settled judicial construction of the immunity provision, indicate that Congress required records to be kept as a means of enforcing the statute and did not intend to frustrate the use of those records for enforcement action by granting an immunity bonus to individuals compelled to disclose their required records to the Administrator.

---

statutes enacted in response to the recent wartime exigencies also contain these provisions:

Second War Powers Act [50 U. S. C. App. §§ 633, subsecs. 2 (a) (3), (4)].

Stabilization Act of 1942 [50 U. S. C. App. §§ 967 (b), 962].

War and Defense Contract Acts [50 U. S. C. App. § 1152 (a) (3), (4)].

War Labor Disputes Act [50 U. S. C. App. § 1507 (a) (3), (b)].

Very recent regulatory statutes, whose construction may also be affected or determined by the ruling of the Court in the present case, include:

Atomic Energy Act of 1946 [42 U. S. C. §§ 1812 (a) (3), 1810 (c)].

Labor Management Relations Act of 1947, § 101, subsecs. 11, 6; § 207 (c), 61 Stat. 136, 150, 140, 155.

8

The very language of § 202 (a) discloses that the record-keeping and inspection requirements were designed not merely to "obtain information" for assistance in prescribing regulations or orders under the statute, but also to aid "in the administration and *enforcement* of this Act and regulations, orders, and price schedules thereunder." [5]

The legislative history of § 202 casts even stronger light on the meaning of the words used in that section. On July 30, 1941, the President of the United States, in a message to Congress, requested price-control legislation conferring effective authority to curb evasion and bootlegging.[6] Two days later the Price Control Bill was introduced in the House by Representative Steagall, and referred to the Committee on Banking and Currency.

As introduced, and as reported out of the Committee on November 7, 1941, the bill included broad investigatory, record-keeping, licensing, and other enforcement powers to be exercised by the Administrator.[7] While it

---

[5] Italics have been added here and in all other quotations in which they appear, unless otherwise noted.

[6] ". . . the existing authority over prices is indirect and circumscribed and operates through measures which are not appropriate or applicable in all circumstances. It has further been weakened by those who purport to recognize need for price stabilization yet challenge the existence of any effective power. In some cases, moreover, there has been evasion and bootlegging; in other cases the Office of Price Administration and Civilian Supply has been openly defied.

"Faced now with the prospect of inflationary price advances, legislative action can no longer prudently be postponed. Our national safety demands that we take steps at once to extend, clarify, and strengthen the authority of the Government to act in the interest of the general welfare." H. Doc. No. 332, 77th Cong., 1st Sess. 3 (1941).

[7] See 87 Cong. Rec. 9148 (1941) for the precise wording of § 202, which was then numbered § 211.

The full text of § 202 as enacted is as follows:

"(a) The Administrator is authorized to make such studies and investigations, to conduct such hearings, and to obtain such informa-

was before the House, Representative Wolcott on November 28, 1941, offered as a substitute for § 201 a series of

tion as he deems necessary or proper to assist him in prescribing any regulation or order under this Act, or in the administration and enforcement of this Act and regulations, orders, and price schedules thereunder.

"(b) The Administrator is further authorized, by regulation or order, to require any person who is engaged in the business of dealing with any commodity, or who rents or offers for rent or acts as broker or agent for the rental of any housing accommodations, to furnish any such information under oath or affirmation or otherwise, to make and keep records and other documents, and to make reports, and he may require any such person to permit the inspection and copying of records and other documents, the inspection of inventories, and the inspection of defense-area housing accommodations. The Administrator may administer oaths and affirmations and may, whenever necessary, by subpena require any such person to appear and testify or to appear and produce documents, or both, at any designated place.

"(c) For the purpose of obtaining any information under subsection (a), the Administrator may by subpena require any other person to appear and testify or to appear and produce documents, or both, at any designated place.

"(d) The production of a person's documents at any place other than his place of business shall not be required under this section in any case in which, prior to the return date specified in the subpena issued with respect thereto, such person either has furnished the Administrator with a copy of such documents (certified by such person under oath to be a true and correct copy), or has entered into a stipulation with the Administrator as to the information contained in such documents.

"(e) In case of contumacy by, or refusal to obey a subpena served upon, any person referred to in subsection (c), the district court for any district in which such person is found or resides or transacts business, upon application by the Administrator, shall have jurisdiction to issue an order requiring such person to appear and give testimony or to appear and produce documents, or both; and any failure to obey such order of the court may be punished by such court as a contempt thereof. The provisions of this subsection shall also apply to any person referred to in subsection (b), and shall be in addition to the provisions of section 4 (a).

"(f) Witnesses subpenaed under this section shall be paid the same

amendments, one of which authorized the Administrator "to subpena documents and witnesses for the purpose of obtaining information in respect to the establishment of price ceilings, and a review of price ceilings." [8] This amendment was adopted. Thereupon Representative Wolcott moved to strike out as "redundant" the much broader and far more rigorous provisions in the bill (§ 202), which authorized the Administrator to "require the making and keeping of records and other documents and the making of reports," and to "obtain or require the furnishing of such information under oath or affirmation or otherwise, as he deems necessary or proper to assist him in prescribing any regulation or order under this act, and in the administration and enforcement of this act, and regulations and orders thereunder." [9] This amendment too was accepted by the House. [10]

It is significant to note that the Senate Committee on Banking and Currency began its consideration of the

---

fees and mileage as are paid witnesses in the district courts of the United States.

"(g) No person shall be excused from complying with any requirements under this section because of his privilege against self-incrimination, but the immunity provisions of the Compulsory Testimony Act of February 11, 1893 (U. S. C., 1934 edition, title 49, sec. 46), shall apply with respect to any individual who specifically claims such privilege.

"(h) The Administrator shall not publish or disclose any information obtained under this Act that such Administrator deems confidential or with reference to which a request for confidential treatment is made by the person furnishing such information, unless he determines that the withholding thereof is contrary to the interest of the national defense and security.

"(i) Any person subpenaed under this section shall have the right to make a record of his testimony and to be represented by counsel." 56 Stat. 23, 30, as amended by § 105 of the Stabilization Extension Act of 1944, 58 Stat. 632, 637, 50 U. S. C. § 922.

[8] 87 Cong. Rec. at 9232; see also *id.* at 9226.

[9] *Id.* at 9231.

[10] *Id.* at 9233.

bill on December 9, 1941, the day after Congress declared the existence of a state of war between this country and the Imperial Government of Japan. Appearing before the Senate Committee in this wartime setting, the proponents of the original measure requested and secured the restoration of the enforcement powers which the House had stricken.[11] They asserted that a major aspect of the investigatory powers contained in the bill as originally drafted was to enable the Administrator to ferret out violations and enforce the law against the violators.[12] And it was pointed out that in striking down the authority originally given the Administrator in the committee bill to require the maintenance of records, the House had substantially stripped him of his investigatory and enforcement powers,

> "because no investigatory power can be effective without the right to insist upon the maintenance of records. By the simple device of failing to keep records of pertinent transactions, or by destroying or falsifying such records, a person may violate the act with impunity and little fear of detection. Especially is this true in the case of price-control legislation, which operates on many diverse industries and commodities, each industry having its own trade practices and methods of operation.

---

[11] As pointed out by the Senate Committee, ". . . in amending the House bill, the committee has sought to strengthen it. That bill, when we were not actually at war, might have sufficed. If the authority granted had proved inadequate, additional powers might have been sought and there might have been time to do so. But the swiftly moving pace of war, with evidences of inflation already apparent, leaves little time for the luxury of experiment. The need for price stability is urgent. . . ." S. Rep. No. 931, 77th Cong., 2d Sess. 3 (Jan. 2, 1942).

[12] *Hearings before the Senate Committee on Banking and Currency on H. R. 5990,* 77th Cong., 1st Sess. 192 (1941). (The reference is contained in a brief filed with the Committee by the General Counsel of the Office of Price Administration.)

"The House bill also deprives the Administrator of the power to require reports and to make inspections and to copy documents. By this deprivation the Administrator's supervision over the operation of the act is rendered most difficult. He has no expeditious way of checking on compliance. He is left without ready power to discover violations.

"It should not be forgotten that the statute to be administered is an emergency statute. To put teeth into the Price Control Act, it is imperative that the Administrator's investigatory powers be strong, clear, and well adapted to the objective. . . ." [13]

Emphasis was placed on the restoration of licensing provisions, which the House had deleted from the Price Control Bill as originally drafted. The General Counsel for the OPA contended that licensing was the backbone of enforcement of price schedules and regulations.[14] The

---

[13] *Id.* at 193.

It is apparently conceded that the written statement presented to the Senate Committee by the General Counsel of the OPA in its hearings sets forth the construction that this Court sustains in affirming the judgment of the Circuit Court of Appeals for the Second Circuit in this case. We may accord to the construction expounded during the course of the hearings at least that weight which this Court has in the past given to the contemporaneous interpretation of an administrative agency affected by a statute, especially where it appears that the agency has actively sponsored the particular provisions which it interprets. And we may treat those contemporaneous expressions of opinion as "highly relevant and material evidence of the probable general understanding of the times and of the opinions of men who probably were active in the drafting of the statute. As such, they are entitled to serious consideration . . ." *White* v. *Winchester Club,* 315 U. S. 32, 41 (1942). See also *United States* v. *American Trucking Assns.,* 310 U. S. 534, 549 (1940); *Hassett* v. *Welch,* 303 U. S. 303, 310–311 (1938).

[14] *Hearings, supra* note 12, at 181; see also *id.* at 154, 179–80 (oral testimony), 190–200; 88 Cong. Rec. 61, 693–94 (1942); S. Rep. No. 931, 77th Cong., 2d Sess. 8–9, 19 (1942).

World War I prototype of the Price Control Act, the Lever Act, had contained authority for the President to license the distribution of any necessaries whenever deemed essential "in order to carry into effect any of the purposes of this Act . . . ." [15]   It was pointed out that "The general licensing regulations prescribed under the Lever Act, applicable to all licensees, required the making of reports (rule 1), the permitting of inspection (rule 2), and the keeping of records (rule 3)." [16]   And it was noted that licensing had been employed in connection with the fuel provisions of the Act *"as a method of obtaining information, of insuring universal compliance, and of enforcing refunds of overcharges and the payment of penalty charges to war charities."* [17]   By li-

---

[15] Section 5, 40 Stat. 277 (1917).   Although § 4 of the Lever Act, making it unlawful for any person to make any "unjust or unreasonable rate or charge" for handling or dealing in necessaries, was held unconstitutional because of lack of an ascertainable standard of guilt in *United States* v. *Cohen Grocery Co.*, 255 U. S. 81 (1921), the validity of the licensing and record-keeping provisions was not challenged.

[16] *Hearings, supra* note 12, at 183; see also *id.* at 154.

[17] *Id.* at 184.

The Report of the Senate Committee, following these hearings, recognized the key importance of licensing provisions for effective enforcement of the statute, noting that the "broad licensing power" which had been given to the Food Administrator under the Lever Act "was extensively and effectively used."   The Report specifically referred also to the experience of the Fuel Administration, which at first lacked the power to license, then discovered the need for the power, and after acquiring it, secured "highly effective" enforcement results.   The Report concluded that ". . . where there are many sellers, as in retailing, for example, it is impossible to determine who is subject to control, much less enforce price regulations, without licensing.   Of these facts industry is fully aware.   Licensing provides a simple and direct control over violators . . . ."   S. Rep. No. 931, 77th Cong., 2d Sess. 8–9.

Speaking critically of the Conference Report, Representative Gifford, who was a Manager on the part of the House and had refused

censing middlemen, "Violations were readily discovered by examination of the records which each licensee was required to submit." [18]

With this background,[19] Congress restored licensing powers to the Administrator in the Price Control Bill as

---

to sign the Report and the Statement by the Managers, described licensing then in practice in Canada as a parallel to the licensing proposed by the amended Bill. He called the attention of the House to the Canadian statement of policy: "These restrictions are not designed to curtail business operations in any way. But by placing every person who in any way handles the commodities named in the order under license, the Board will have the machinery with which to make speedy checks on available stocks and *to police more effectively any price-fixing order which may be instituted.*" 88 Cong. Rec. 672 (1942). (Rep. Gifford quoted the statement from "a compiled brief on the licensing methods;" it appears, together with other data referred to by Rep. Gifford, in the section on licensing methods in the brief presented during the Senate hearings by the General Counsel of the OPA, cited *supra* note 12, at p. 188.)

[18] *Hearings, supra* note 12, at 184.

[19] In asking unanimous consent for the Committee to file its report on the next day, Senator Barkley, the Majority Leader and a member of the Committee, stated on the floor of the Senate on January 2, 1942, that these "hearings [held before the Senate Committee from December 9–17] have been in print for a week or two." 87 Cong. Rec. 10142. The Senate vote approving the House Bill as amended was not taken until January 10, more than two weeks after the hearings appeared in printed form. 88 Cong. Rec. 242. The House agreed to the Conference Report on January 26. *Id.* at 689. The Senate accepted the Conference Report on January 27. *Id.* at 725. And the Bill was approved and signed by the President on January 30. *Id.* at 911.

It is also of some interest to note the statement, contained in the Senate Report on the Bill, that a subcommittee which had been appointed immediately after the conclusion of the December 9–17 hearings *"extensively revised and strengthened the House bill in the light of the hearings and the onslaught of war."* S. Rep. No. 931, 77th Cong., 2d Sess. 6 (Jan. 2, 1942). We assume that this record of the Senate Committee proceedings merits the same presumption of regularity as the record of a county criminal court. Cf. *Foster* v. *Illinois*, 332 U. S. 134, 138 (1947).

enacted, § 205, 50 U. S. C. App. § 925 (f), and provided for the suspension by court action of the license of any person found to have violated any of the provisions of the license or price schedules or other requirements. Non-retail fruit dealers, including petitioner in the present case, were licensed under § 9a of Maximum Price Regulation No. 426, 8 F. R. 16411 (1943).

It is difficult to believe that Congress, whose attention was invited by the proponents of the Price Control Act to the vital importance of the licensing, record-keeping and inspection provisions in aiding effective enforcement of the Lever Act, could possibly have intended § 202 (g) to proffer a "gratuity to crime" by granting immunity to custodians of non-privileged records. Nor is it easy to conceive that Congress could have intended private privilege to attach to records whose keeping it authorized the Administrator to require on the express supposition that it was thereby inserting "teeth" into the Price Control Act since the Administrator, *by the use of such records,* could readily discover violations, check on compliance, and *prevent violations from being committed "with impunity."*

In conformance with these views, the bill as passed by Congress empowered the Administrator to require the making and keeping of records by all persons subject to the statute, and to compel, by legal process, oral testimony of witnesses and the production of documents deemed necessary in the administration and enforcement of the statute and regulations. It also included the immunity proviso, subsection (g) of § 202, as to which no special attention seems to have been paid in the debates, although it was undoubtedly included, as it had been in other statutes, as a "usual administrative provision," [20] intended to fulfill the purpose customarily fulfilled by such a provision.

---

[20] See *Joint Hearings on S. 2475 and H. R. 7200* (Fair Labor Standards Act), 75th Cong., 1st Sess. 61 (1937).

16

The inescapable implications of the legislative history related above concerning the other subsections of § 202 would appear to be that Congress did not intend the scope of the statutory immunity to be so broad as to confer a bonus for the production of information otherwise obtainable.

Moreover, there is a presumption that Congress, in re-enacting the immunity provision of the 1893 Act, was aware of the settled judicial construction of the statutory immunity. In adopting the language used in the earlier act, Congress "must be considered to have adopted also the construction given by this Court to such language, and made it a part of the enactment." [21] That judicial construction is made up of the doctrines enunciated by this Court in spelling out the non-privileged status of records validly required by law to be kept, in *Wilson* v. *United States,* 221 U. S. 361 (1911), and the inapplicability of immunity provisions to non-privileged documents, in *Heike* v. *United States,* 227 U. S. 131 (1913).

In the former case, Wilson, the president of a corporation, was required by subpoena to produce the corporate books in his custody before a grand jury. He appeared before the grand jury but refused to deliver up the records on the ground that their contents would tend to incriminate him, and claimed privilege under the Fifth Amendment. On review in this Court of the judgment committing him for contempt, Wilson based his defense in part on the theory that he would have been protected in his constitutional privilege against self-incrimination had he been sworn as a witness, and that the government's failure to permit him to be sworn could not deprive him of such protection.[22] This argument was disposed

[21] *Hecht* v. *Malley,* 265 U. S. 144, 153 (1924); see also *Missouri* v. *Ross,* 299 U. S. 72, 75 (1936); *Sessions* v. *Romadka,* 145 U. S. 29, 42 (1892).

[22] See digest of brief for appellant in *Wilson* v. *United States,* 55 L. Ed. 771, 773 (1911).

of by the Court simply on the ground that a corporate officer has no such constitutional privilege as to corporate records in his possession, even though they contain entries made by himself which disclose his crime. Mr. Justice Hughes, announcing the opinion of the Court, based the decision on the reasoning (which this Court recently cited with approval, in *Davis* v. *United States,* 328 U. S. 582, 589–90 [1946]) that

> "the physical custody of incriminating documents does not of itself protect the custodian against their compulsory production. The question still remains with respect to the nature of the documents and the capacity in which they are held. It may yet appear that they are of a character which subjects them to the scrutiny demanded and that the custodian has voluntarily assumed a duty which overrides his claim of privilege. . . . The principle applies not only to public documents in public offices, but also to *records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation and the enforcement of restrictions validly established. There the privilege, which exists as to private papers, cannot be maintained."* [23]

As illustrations of documents meeting this "required records" test, the Court cited with approval state supreme court decisions that business records kept under requirement of law by private individuals in *unincorporated* enterprises were " 'public documents, which the defendant was required to keep, not for his private uses, but for the benefit of the public, and for public.

---

[23] *Wilson* v. *United States,* 221 U. S. 361, 380 (1911). Holmes, J., in *Heike* v. *United States,* 227 U. S. 131, 143 (1913), emphasized that the decision in *Wilson* went "upon the absence of constitutional privilege, not upon the ground of statutory immunity in such a case."

inspection.' " [24]    The non-corporate records treated as public in those cases concerned such individuals as druggists required by statute to keep a record of all sales of intoxicating liquors.[25]    The corporate and non-corpo-

---

[24] *Wilson, supra* note 23, at 381. In a later decision involving the alleged ability of corporate officers to assert constitutional privilege in relation to records required to be kept under a regulatory statute, Hughes, J., speaking for the Court, further spelled out the implications of the *Wilson* case and of the "required records" doctrine:

". . . the transactions to which the required reports relate are corporate transactions subject to the regulating power of Congress. And, with regard to the keeping of suitable records of corporate administration, and the making of reports of corporate action, where these are ordered by the Commission under the authority of Congress, the officers of the corporation, by virtue of the assumption of their duties as such, are bound by the corporate obligation and cannot claim a personal privilege in hostility to the requirement." *Baltimore & O. R. Co.* v. *I. C. C.*, 221 U. S. 612, 622–23 (1911).

Thus the significant element in determining the absence of constitutional privilege was the fact that the records in question had been validly required to be kept to enable the Commission "properly to perform its duty to enforce the law." *Id.* at 622. The fact that the individuals claiming the privilege were corporate officers was significant only in that the business transactions subject to the Interstate Commerce Act and the records required to be kept were corporate. And, as corporate officers, they were bound by the obligation imposed by the statute upon their corporation to keep the record. In other words, they were deemed custodians of the records for the Interstate Commerce Commission, not merely for the corporation. Had the transactions there regulated, and the records there required, concerned an unincorporated business, Justice Hughes' rationale sustaining the absence of constitutional privilege against self-incrimination would still apply with undiminished force.

This decision was cited with approval in *United States* v. *Darby*, 312 U. S. 100, 125 (1941), in support of the Court's holding that it is constitutional for Congress, as a means of enforcing the valid regulations imposed by the Fair Labor Standards Act, to require an employer to keep records of wages and hours of his employees. See note 42 *infra*.

[25] Other state supreme court decisions, subsequent to the *Wilson* case, similarly treat as non-privileged, records required by statute

rate businesses required by the Price Control Act to keep
records embrace a much greater number of enterprises
than those similarly regulated by the states and munici-
palities. But, since it is conceded that the increased scope
of regulation under the wartime measure here involved
does not render that Act unconstitutional, the "required
· records" doctrine which this Court approved as applied
to non-corporate businessmen in the state cases would
appear equally applicable in the case at bar.

In the *Heike* case, this Court, per Holmes, J., laid
down a standard for the construction of statutory im-
munity provisos which clearly requires affirmance of the
decision of the circuit court here: ". . . the obvious pur-
pose of the statute is to make evidence available and
compulsory that otherwise could not be got. We see no
reason for supposing that the act offered a *gratuity to
crime. It should be construed, so far as its words fairly
allow the construction, as coterminous with what other-
wise would have been the privilege of the person con-
cerned."* [26]   In view of the clear rationale in *Wilson*, taken
together with the ruling in *Heike* as to how statutory
immunity provisos should be construed, the conclusion
seems inevitable that Congress must have intended the
immunity proviso in the Price Control Act to be coter-
minous with what would otherwise have been the con-
stitutional privilege of petitioner in the case at bar.

---

to be kept by such individuals as licensed fish dealers, *Paladini* v.
*Superior Court,* 178 Cal. 369, 372–74, 173 P. 588, 590 (1918);
junk dealers regulated by municipal ordinance, *St. Louis* v. *Baskovitz,*
273 Mo. 543, 201 S. W. 870 (1918), or by statute, *State* v. *Legora,*
162 Tenn. 122, 127–28, 34 S. W. 2d 1056, 1057–58 (1931), cf. *Rosen-
thal* v. *New York,* 226 U. S. 260, 268–69 (1912); dealers in raw
furs, *State* v. *Stein,* 215 Minn. 308, 9 N. W. 2d 763 (1943); and
licensed money lenders, *Financial Aid Corp.* v. *Wallace,* 216 Ind. 114,
117–119, 122–124, 23 N. E. 2d 472, 474, 476 (1939).

[26] *Heike, supra* note 23, at 142.

Since he could assert no valid privilege as to the required records here in question, he was entitled to no immunity under the statute thus viewed.

The traditional rule that re-enactment of a statute creates a presumption of legislative adoption of previous judicial construction may properly be applied here, since the Court in *Heike* regarded the 1903 immunity statute there construed as identical, in policy and in the scope of immunity furnished, with the Compulsory Testimony Act of 1893, which has been re-enacted by incorporation into the Price Control Act.

In addition, scrutiny of the precise wording of § 202 (g) of the latter statute indicates that the draftsmen of that section went to some pains to ensure that the immunity provided for would be construed by the courts as being so limited. The construction adopted in the *Heike* decision was rendered somewhat difficult because neither the Compulsory Testimony Act of 1893 nor the immunity proviso in the 1903 Act made any explicit reference to the constitutional privilege against self-incrimination, with whose scope the Court nonetheless held the immunity to be coterminous. Section 202 (g), on the other hand, follows a pattern set by the Securities Act of 1933 and expressly refers to that privilege, thus apparently seeking to make it doubly certain that the courts would construe the immunity there granted as no broader than the privilege:

> "*No person shall be excused* from complying with any requirements under this section *because of his privilege against self-incrimination,* but the immunity provisions of the Compulsory Testimony Act of Feb. 11, 1893 . . . shall apply with respect to any individual who specifically claims *such privilege.*"

A comparison of the precise wording of § 202 (g) with the wording of immunity provisions contained in earlier

statutes [27] readily suggests one function intended by the drafters of § 202 (g) to be performed by the additional phrases expressly referring to "privilege"—*viz.*, that of underlining the legislative intention of requiring *an exchange* of constitutional privilege for immunity, an intent which the Court had previously thought discernable even in the less obvious terms used by the drafters of the earlier statutes. Thus the immunity provisions of the Compulsory Testimony Act can be relied upon here only if the two prerequisites set forth in § 202 (g) are satisfied: (1) that the person seeking to avail himself of the immunity could actually have been excused, in the absence

---

[27] See analysis of the earlier provisos in 8 Wigmore, Evidence, 511 n.9 (3d ed. 1940), and in the brief submitted by the Government in *Heike,* a digest of which appears at 227 U. S. 137. Whether the stronger wording in the Price Control Act and other recent enactments be deemed to indicate a "new legislative purpose," as the majority of the Court in *United States* v. *Monia,* 317 U. S. 424 (1943), ruled that it did in connection with a procedural point not involved in the present case—or be deemed nothing more than "a careful rephrasing of a conventional statutory provision," as the dissenters in *Monia, supra* at 446, believed, the more stringent phrasing of the Price Control Act proviso must, in either view, be regarded as strengthening the applicability of the rule of construction of the *Heike* case.

The precise holding in *Monia* was that a witness before an investigatory body need not claim his privilege as a prerequisite to earning immunity under a pre-1933 statute which offered immunity without any reference to the need for making such a claim. The majority considered the *Heike* decision inapplicable to *Monia* because the relevant terms of the immunity proviso involved in the latter case were so plain and so sharply in contrast with the wording of the enactments after 1933, which (including the Price Control Act) expressly require the assertion of the claim, that Congress could not have intended the pre-1933 statute to require a witness to assert his claim. And it was emphasized that, to construe congressional intention otherwise in those circumstances, might well result in entrapment of witnesses as to testimony concededly privileged. We do not perceive such distinguishing factors in the case at bar, and accordingly consider the *Heike* rationale fully applicable here.

of this section, from complying with any of its requirements because of his constitutional privilege against self-incrimination, and (2) that the person specifically claim such privilege. Obviously if prerequisite (1) is not fulfilled, the mere fact that the person specifically claims a non-existent privilege was not intended by Congress to entitle him to the benefit of the immunity. And this is so whether the statute be construed with particular reference to its grammar, its historical genesis, or its rational function.

Petitioner does not deny that the actual existence of a genuine privilege against self-incrimination is an absolute prerequisite for the attainment of immunity under § 202 (g) by a corporate officer who has been compelled by subpoena to produce required records; and that, under the *Heike* ruling, the assertion of a claim to such a privilege in connection with records which are in fact non-privileged is unavailing to secure immunity, where the claimant is a corporate officer. But, while conceding that the statute should be so construed where corporate officials are concerned, the petitioner necessarily attributes to Congress the paradoxical intention of awarding immunity in exchange for a claim of privilege as to records of a claimant engaged in non-corporate business, though his business is similarly subjected to governmental price control, and its required records are, under the *Wilson* rationale, similarly non-privileged.

The implausibility of any such interpretation of congressional intent is highlighted by the unquestioned fact that Congress provided for price regulations enforcible against unincorporated entrepreneurs as well as corporate industry. It is also unquestionable that Congress, to ensure that violations of the statute should not go unpunished, required records to be kept of all relevant buying and selling transactions by all individual and corporate business subject to the statute. If these aspects of con-

gressional intention be conceded, it is most difficult to comprehend why Congress should be assumed to have differentiated *sub silentio,* for purposes of the immunity proviso, between records required to be kept by individuals and records required to be kept by corporations. Such an assumption carries with it the incongruous result that individuals forced to produce records required to be kept for the Administrator's inspection and use in enforcing the price regulations would be given a bonus of immunity if engaged in non-corporate business, thus rendering the records of non-corporate enterprise virtually useless for enforcement purposes,[28] whereas individuals disclosing the very same type of required records but engaged in corporate enterprise would not be given that bonus. In effect, this is to say that Congress intended the immunity proviso to frustrate a major aim of its statutory requirement of record-keeping and record in-

---

[28] See Judge Delehant's well-reasoned discussion, in *Bowles* v. *Misle,* 64 F. Supp. 835, 843 (1946), of the "public or semi-public" character of records kept by a non-corporate entrepreneur subject in his business to such governmental regulation: ". . . if the regulating authority may be intercepted altogether at the door of a regulated business in its quest of information touching the observance of the law and applicable regulations, its ministry must be fruitless. And it can be no more effective if, realistically viewed, the administrator's examination may be made only at a bargain which absolves the proprietor of the business from the sanctions, whether civil or criminal, by law provided for such violations of the regulations, and, therefore, of the law as examination may disclose. . . ."

Compare the dictum in *United States* v. *Mulligan,* 268 F. 893 (N. D. N. Y. 1920), that records required to be kept by an unincorporated businessman under the Lever Act were not privileged, and that information contained therein was available for use in criminal prosecutions against the record-keeper himself. Like the Price Control Act, the Lever Act contained a compulsory testimony immunity provision. § 25, 40 Stat. 285. The memorandum filed with the Senate Committee, cited *supra* note 12, at 194, specifically referred to the "well-stated" opinion in the *Mulligan* case.

spection so far as it applies to non-corporate business-men, but not so far as it applies to corporate officers.[29]

It is contended that to construe the immunity proviso as we have here is to devitalize, if not render meaningless, the phrase "any requirements" [30] which appears in the opening clause of § 202 (g) : "No person shall be excused from complying with any requirements under this section because of his privilege against self-incrimination . . . ." It is urged that, since § 202 includes among its require-

---

[29] The extreme unlikelihood that such a distinction, not expressly stated anywhere in the Act, was nevertheless intended by Congress becomes even more apparent in the light of express provision in the statute, § 4 (a), making it unlawful for any person subject to the Act, whether in corporate or unincorporated business enterprise, to fail to comply with the record-keeping requirements of § 202 (b), and making it unlawful, § 205 (b), for any such person to make "any statement or entry false in any material respect in any document or report required to be kept or filed" under § 202 (b). Even in the absence of the judicial background highlighted by the rationale of the *Wilson* and *Heike* decisions, it would be difficult to imagine that records properly required to be kept by the Government, for government use in the administration of a regulatory statute, with penalties of fines and imprisonment applicable against any person subject to the statute who fails to keep those records or who falsifies entries in them, could still be regarded by Congress or the public as private records concerning which the recorder may assert a privilege against self-incrimination.

[30] The phrase "any requirements" appears also in the immunity provision of the Atomic Energy Act of 1946, 42 U. S. C. § 1812 (a) (3). There, as in the Price Control Act, some of the requirements referred to would, in the absence of the section, be excusable because of privilege—*e. g.*, compelled oral testimony—while other requirements, including the compulsory production of records which had been kept pursuant to the statute (§ 1810 [c]), would, under the *Wilson* doctrine, have the same non-privileged (and hence non-immunizing) status as the sales record involved in the present case. Compare also the phraseology used in such statutes as the War and Defense Contract Acts, 50 U. S. C. App. § 1152 (a) (3), (4), and Freight Forwarders Act (1942), 49 U. S. C. § 1017 (a). (b), (d).

ments the furnishing of information under oath, the making and keeping of records and reports, the inspection and copying of records and other documents, and the appearing and testifying or producing of documents, the immunity provided must cover compliance with any one of these requirements. The short answer to that contention is that the immunity provided does cover compliance with any of these requirements *as to which a person would have been excused from compliance because of his privilege,* were it not for the statutory grant of immunity *in exchange for such privilege.*[31] The express language of the proviso, as well as its historical background, readily suggests this reasonable interpretation. Even those who oppose this interpretation must and do concede that Congress had no intention of removing the excuse of privilege where the privilege is absent from the outset because the records whose production is ordered and concerning which privilege is asserted are corporate records. If this concession is made, surely logic as well as history requires a similar reading of the proviso in connection with validly required non-corporate records, as to which privilege is similarly absent from the outset.

If the contention advanced against our interpretation be valid, the Court must have erred in its construction of the immunity proviso in the *Heike* case. For the 1893 Act, 49 U. S. C. § 46, which it was in effect construing, provides that, "No person shall be excused

---

[31] Compare the paraphrase of § 202 (g) contained in the Committee Reports: ". . . Although no person is *excused from complying with any requirement* of this subsection *because of his privilege against self-incrimination,* the immunity provisions of the Compulsory Testimony Act of February 11, 1893, are made applicable with respect to any individual who specifically claims *such privilege.*" S. Rep. No. 931, 77th Cong., 2d Sess. 21; H. R. Rep. No. 1409, 77th Cong., 1st Sess. 9. (Italics added here, as elsewhere unless otherwise noted.)

from attending and testifying or from producing books, papers, tariffs, contracts, agreements, and documents before the Interstate Commerce Commission . . . for the reason that the testimony or evidence, documentary or otherwise, required of him, may tend to criminate him or subject him to a penalty or forfeiture. But no person shall be prosecuted . . . for or on account of any transaction . . . concerning which he may testify, or produce evidence, documentary or otherwise . . . ." Thus the immunity part of the 1893 statute extended to *any* *documentary* as well as oral testimony concerning which there might be a claim of privilege. And included among the documents which the immunity-seeker might be compelled to produce were records maintained by common carriers in compliance with the requirements of the Interstate Commerce Act,[32] and hence obviously within the definition of public records set forth in the *Wilson* and *Heike* decisions. If the reasoning advanced against the interpretation of § 202 (g) we have proposed were valid, then it might equally well be contended that the Court in the *Heike* decision devitalized, if not rendered meaningless the phrase "documentary or otherwise" in the immunity section of the 1893 Act.

Actually, neither the interpretation as applied in the *Heike* decision nor as expounded here renders meaningless any of the words in the immunity provision. In each case, the immunity proviso is set forth in conjunction with record-keeping requirements. And in each case, where the immunity provided concerns documents whose production might otherwise be excused on the ground of

---

[32] Section 6 of the Interstate Commerce Act of Feb. 4, 1887, c. 104, 24 Stat. 380, required every common carrier subject to the provisions of the statute to file with the Commission copies of its schedules and tariffs of rates, fares, and charges, and of all contracts and agreements between carriers.

privilege, the documents referred to are all writings whose keeping as records has *not* been required by valid statute or regulation. Of course all *oral* testimony by individuals can properly be compelled only by exchange of immunity for waiver of privilege.[33]

---

[33] It is further suggested that the presence of statutory provisions for confidential treatment, in certain limited respects, of information obtained by the Administrator is inconsistent with the views of this opinion. We find no such inconsistency in the presence of §§ 4 (c) and 202 (h), the provisions which specify the types of confidential safeguards intended.

"Section 4 (c) affords protection to those persons required to disclose information to the Administrator by making it unlawful for any officer or employee of the Government, or for any adviser or consultant to the Administrator in his official capacity, *to disclose or to use for his personal benefit, any information obtained under the bill.* Further provision for confidential treatment of such information is found in section 202 (b) [changed in Conference to § 202 (h)]. . . . Section 202 (b) gives further protection to persons furnishing information to the Administrator under the bill by directing the Administrator, upon the request of the party furnishing such information, or if he deems such information confidential, *not to disclose such information unless he deems that the public interest requires such disclosure.*" S. Rep. No. 931, 77th Cong., 2d Sess. 20–21.

This is substantially the same sort of confidential treatment provided for by the Hepburn Act of 1906, 34 Stat. 594, amending the Interstate Commerce Act: "Any examiner who divulges any fact or information which may come to his knowledge during the course of such examination, *except in so far as he may be directed by the Commission or by a court or judge thereof,* shall be subject, upon conviction in any court of the United States of competent jurisdiction, to a fine of not more than five thousand dollars or imprisonment for a term not exceeding two years, or both." 49 U. S. C. § 20 (7) (f). Numerous other statutes have incorporated almost identically worded provisions. See *e. g.,* Motor Carrier Act of 1935, 49 U. S. C. § 322 (d).

In statutes such as these, where Congress validly distinguishes required records from private papers, with respect to the availability

28

The Court in the *Heike* case was confronted with the further contention that the 1903 immunity statute, which was immediately before it, had been passed when "there was an imperious popular demand that the inside working of the trusts should be investigated, and that the people and Congress cared so much to secure the necessary evidence that they were willing that some guilty persons should escape, as that reward was necessary to the end." [34] In the light of the express statements in the legislative history of the Price Control Act as to the enforcement role of the investigatory powers, such an argument would hardly be tenable in the present case. Yet even in the *Heike* case where such an argument had some elements of plausibility, the Court had no difficulty in rejecting it in favor of the Government's contention that "the statute should be limited as nearly as may be by the boundaries of the constitutional privilege of which it takes the place." [35]

As a final answer, an understanding of the 1893 immunity provision, based on its full historical context, should suffice to explain the limited function contemplated by Congress in incorporating that provision into the 1942 statute. The 1893 provision was enacted merely to provide an immunity sufficiently broad to be an ade-

of the required documents as evidence in criminal or other proceedings to enforce the statute for whose effectuation they are kept, nothing in logic nor historical practice requires Congress at the same time to treat the records as public in the sense that they be open at all times to scrutiny by the merely curious. See *Coleman* v. *United States,* 153 F. 2d 400, 402–04 (C. C. A. 6, 1946). Congress expressly foreclosed such a result in the Emergency Price Control Act, and this opinion neither requires nor permits it.

[34] *Heike, supra* note 23, at 141.

[35] *Id.* at 141–42. It would appear that the persuasive brief for the Government in this case, prepared with the assistance of eminent counsel, called forth a Holmesian echo.

quate substitute for the constitutional privilege, since previous statutory provision for immunity had been found by the Court in *Counselman* v. *Hitchcock,* 142 U. S. 547 (1892), not to be coextensive with the privilege, thus rendering unconstitutional the statutory requirements for compulsory production of privileged documents and oral testimony.[36]

The suggestion has been advanced that the scope of the immunity intended by Congress should be ascertained, not by reference to the judicial and legislative history considered above, but by reference to the principle expounded in *Federal Trade Comm'n* v. *American Tobacco Co.,* 264 U. S. 298, 307 (1924), of construing a broad grant of statutory authority so as to avoid attributing to Congress "an intent to defy the Fourth Amendment or even to come so near to doing so as to raise a serious question of constitutional law."

It is interesting to note that Congress, in enacting the Price Control Bill, apparently did intend to rely upon the principle of *American Tobacco* in circumstances similar to those in which that principle was originally applied: namely, to insure that the power of inspection or examination would not conflict with the prohibition against unreasonable searches and seizures contained in the Fourth Amendment. Senator Brown, who was chairman of the sub-committee on the Price Control Bill and one of the managers on the part of the Senate

---

[36] See *Heike, supra* note 23, at 142; *Brown* v. *Walker,* 161 U. S. 591, 594–5 (1896); *Hale* v. *Henkel,* 201 U. S. 43, 67 (1906). See also the statement made in the House by Representative Wise, of the Committee on Interstate and Foreign Commerce, in presenting the bill which became the basis of the 1893 Compulsory Testimony Act: "The whole scope and effect of the act is simply to meet the decision rendered recently by the Supreme Court in the case known as 'the Councilman [*sic*] case.'" 24 Cong. Rec. 503 (1893).

appointed to confer with the House managers on the Senate amendments, expressly stated it to be the view of the conferees that § 202 (a), which contained broad authorization to the Administrator to "obtain such information as he deems necessary or proper to assist him" in his statutory duties, was intended solely to empower the Administrator to "obtain *relevant* data to enable him properly to discharge his functions, preferably by requiring the furnishing of information under oath or affirmation or otherwise as he may determine. It is not intended, nor is any other provision of the act intended, to confer any power of inspection or examination which might conflict with the fourth amendment of the Constitution of the United States. See opinion of Justice Holmes in *Federal Trade Commission* v. *American Tobacco Co.,* 264 U. S. 298, 307." [37]

It was the abuse of the subpoena power to obtain irrelevant data in the course of a "fishing expedition" with which the Court was concerned in that case. It is clear that if the Administrator sought to obtain data irrelevant to the effective administration of the statute and if his right of access was challenged on the ground that the evidence sought was "plainly incompetent or irrelevant to any lawful purpose" [38] of the Administrator, that objection could sustain a refusal by the district court to issue a subpoena or other writ to compel inspection. But there is no indication in the legislative history that Congress intended the *American Tobacco* principle of construction to govern the immunity proviso of subsection (g), particularly since the scope of that proviso had been so well demarcated by the courts prior to its 1942 re-enactment. And it is not insignificant that the one rule of construction which this Court has, in the past, directly and

---

[37] 88 Cong. Rec. 700 (1942).

[38] *Endicott Johnson Corp.* v. *Perkins,* 317 U. S. 501, 509 (1943).

expressly applied to the immunity proviso—that "It should be construed, so far as its words fairly allow the construction, as coterminous with what otherwise would have been the privilege of the person concerned" [39]—was enunciated by Mr. Justice Holmes, who gave no sign of repudiating that principle by his subsequent statements in the *American Tobacco* case.

Even if the evidence of congressional intent contained in the legislative history were less clear-cut and persuasive, and constitutional doubts more serious than they appear to us, we would still be unconvinced as to the applicability of the *American Tobacco* standard to the construction of the immunity proviso in relation to documentary evidence which is clearly and undeniably relevant, and the recording and keeping of which the Administrator has properly required in advance. For, in construing statutory immunities in such circumstances, we must heed the equally well-settled doctrine of this Court to read a statute, assuming that it is susceptible of either of two opposed interpretations, in the manner which effectuates rather than frustrates the major purpose of the legislative draftsmen. The canon of avoidance of constitutional doubts must, like the "plain meaning" rule, give way where its application would produce a futile result, or an unreasonable result "plainly at variance with the policy of the legislation as a whole." [40] In the present case, not merely does the construction

[39] *Heike, supra* note 23, at 142.

[40] *United States* v. *American Trucking Assns.,* 310 U. S. 534, 543 (1940); see also *Missouri Pacific R. Co.* v. *Boone,* 270 U. S. 466, 472 (1926).

"A restrictive interpretation should not be given a statute merely because Congress has chosen to depart from custom or because giving effect to the express language employed by Congress might require a court to face a constitutional question." *United States* v. *Sullivan,* 332 U. S. 689, 693 (1948).

put forward by the petitioner frustrate the congressional intent as manifested by the legislative history, but it also shuts out the illumination that emanates from key words and phrases in the section when considered, as above, in the context of the history of the Compulsory Testimony Act of 1893, and the construction that had been placed upon it and similar provisos, prior to its incorporation into the Price Control Act.

There remains for consideration only the question as to whether serious doubts of constitutionality are raised if the Price Control Act is thus construed. This issue was not duly raised by petitioner, and it becomes relevant, if at all, only because such doubts are now said to be present if the immunity proviso is interpreted as set forth above.

It may be assumed at the outset that there are limits which the Government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency and may be used in prosecuting statutory violations committed by the record-keeper himself. But no serious misgiving that those bounds have been overstepped would appear to be evoked when there is a sufficient relation between the activity sought to be regulated and the public concern so that the Government can constitutionally regulate or forbid the basic activity concerned, and can constitutionally require the keeping of particular records, subject to inspection by the Administrator. It is not questioned here that Congress has constitutional authority to prescribe commodity prices as a war emergency measure, and that the licensing and record-keeping requirements of the Price Control Act represent a legitimate exercise of that power.[41] Accordingly, the principle enunciated in the *Wilson* case, and reaffirmed as recently as the *Davis* case, is clearly applicable here:

---

[41] Cf. *Yakus* v. *United States,* 321 U. S. 414, 422 (1944).

namely, that the privilege which exists as to private papers cannot be maintained in relation to "records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation and the enforcement of restrictions validly established." [42]

---

[42] *Davis* v. *United States,* 328 U. S. 582, 589–90 (1946). See also *United States* v. *Darby,* 312 U. S. 100, 125 (1941) ("Since . . . Congress may require production for interstate commerce to conform to those conditions [wages and hours], *it may require the employer, as a means of enforcing the valid law, to keep a record showing whether he has in fact complied with it.* The requirement for records even of the intrastate transaction is an appropriate means to the legitimate end. . . ."); *Arrow Distilleries* v. *Alexander,* 109 F. 2d 397, 404–05 (1940); *Di Santo* v. *United States,* 93 F. 2d 948 (1937). Cf. *Rodgers* v. *United States,* 138 F. 2d 992, 995–96 (1943).

In *Boyd* v. *United States,* 116 U. S. 616 (1886), the Court held unconstitutional, as repugnant to the Fourth and Fifth Amendments, an 1874 revenue statute which required the defendant or claimant, on motion of the Government attorney, to produce in court his private books, invoices and papers, or else the allegations of the Government were to be taken as confessed. The document to which the statute had been applied in that case was an invoice, which the Government, as well as the defendant, treated throughout the trial and appellate proceedings as a private business record. The Government defended the constitutionality of the statute thus applied on the ground that the action was not against the claimants, but was merely a civil action *in rem* for the forfeiture of merchandise, in which action the claimants had voluntarily intervened. It argued that in a forfeiture action, private books and papers produced under compulsion have no higher sanctity than other property, since the provision in the Fifth Amendment that no person "shall be compelled in any criminal case to be a witness against himself" applies only to criminal proceedings *in personam.*

In rejecting the Government's contention, the opinion of the majority of the Court proceeded mainly upon a complex interpretation of the Fourth Amendment, taken as intertwined in its purpose and historical origins with the Fifth Amendment. Under that view, "a compulsory production of the private books and papers of the owner of goods sought to be forfeited in such a suit [*i. e.,* a suit for a

34

Even the dissenting Justices in the *Davis* case conceded that "there is an important difference in the constitutional protection afforded their possessors between papers exclusively private and documents having public aspects,"[43] a difference whose essence is that the latter papers, "once they have been legally obtained, are available as evidence."[44] In the case at bar, it cannot be doubted that the sales record which petitioner was required to keep as a licensee under the Price Control Act has "public aspects." Nor can there be any doubt that when it was obtained by the Administrator through the use of a subpoena, as authorized specifically by § 202 (b) of the statute, it was "le-

penalty or forfeiture] is compelling him to be a witness against himself, within the meaning of the Fifth Amendment to the Constitution, and is the equivalent of a search and seizure—and an unreasonable search and seizure—within the meaning of the Fourth Amendment." *Id.* at 634–35; see also *id.* at 621 *et seq.* In other words, the majority opinion construed the prohibition of the Fourth Amendment as applying in the foregoing circumstances "to a returnable writ of seizure describing specific documents in the possession of a specific person." 8 Wigmore, Evidence 368 (3d ed. 1940); see *Hale* v. *Henkel*, 201 U. S. 43, 71–72 (1906).

Holding this view of the Fourth Amendment, the majority of the Court nevertheless carefully distinguished the "unreasonable search and seizure" effected by the statute before it from the "search and seizure" which Congress had provided for in revenue acts that required manufacturers to keep certain records, subject to inspection (see, *e. g.*, Act of July 20, 1868, c. 186, §§ 19, 45, 15 Stat. 133, 143, regulating distillers and rectifiers): ". . . the supervision authorized to be exercised by officers of the revenue over the manufacture or custody of excisable articles, *and the entries thereof in books required by law to be kept for their inspection, are necessarily excepted out of the category of unreasonable searches and seizures. . . . But, when examined with care, it is manifest that there is a total unlikeness of these official acts and proceedings to that which is now under consideration. . . .*" *Id.* at 623–24.

[43] *Davis, supra* note 42, at 602.

[44] *Ibid.*

gally obtained" and hence "available as evidence." [45]    The record involved in the case at bar was a sales record required to be maintained under an appropriate regulation, its relevance to the lawful purpose of the Administrator is unquestioned, and the transaction which it recorded was one in which the petitioner could lawfully engage solely by virtue of the license granted to him under the statute.[46]

In the view that we have taken of the case, we find it unnecessary to consider the additional contention by the Government that, in any event, no immunity attaches to the production of the books by the petitioner because the

---

[45] See dissenting opinion in *Davis, supra* note 42, at 614 n.9.  See also *Amato* v. *Porter,* 157 F. 2d 719 (1946); *Coleman* v. *United States,* 153 F. 2d 400 (1946).

[46] See also the rationale set forth in 8 Wigmore, Evidence § 2259c (3d ed. 1940), a section which was cited with approval by the opinion of the Court in *Davis, supra* note 42, at 590:

"The State requires the books to be kept, but it does not require the officer to commit the crime.  If in the course of committing the crime he makes entries, the criminality of the entries exists by his own choice and election, not by compulsion of law.  The State announced its requirement to keep the books long before there was any crime; so that the entry was made by reason of a command or compulsion which was directed to the class of entries in general, and not to this specific act.  The duty or compulsion to disclose the books existed generically, and prior to the specific act; hence the compulsion is not directed to the criminal act, but is independent of it, and cannot be attributed to it. . . .  The same reasoning applies to *records required by law to be kept* by a *citizen* not being a public official, *e. g.* a druggist's report of liquor sales, or a pawnbroker's record of pledges.  The only difference here is that the duty arises not from the person's general official status, but from the specific statute limited to a particular class of acts.  The duty, or compulsion, is directed as before, to the generic class of acts, not to the criminal act, and is anterior to and independent of the crime; the crime being due to the party's own election, made subsequent to the origin of the duty."  (Italics as in the original.)

connection between the books and the evidence produced at the trial was too tenuous to justify the claim.

For the foregoing reasons, the judgment of the Circuit Court of Appeals is

*Affirmed.*

MR. JUSTICE FRANKFURTER, dissenting.

The Court this day decides that when Congress prescribes for a limited Governmental purpose, enforceable by appropriate sanctions, the form in which some records are to be kept, not by corporations but by private individuals, in what in everyday language is a private and not a Governmental business, Congress thereby takes such records out of the protection of the Constitution against self-incrimination and search and seizure. Decision of constitutional issues is at times unavoidable. But in this case the Court so decides when it is not necessary. The Court makes a drastic break with the past in disregard of the settled principle of constitutional adjudication *not* to pass on a constitutional issue—and here a grave one involving basic civil liberties—if a construction that does no violence to the English language permits its avoidance. This statute clearly permits it.[1] Instead, the Court goes on the assumption that an immunity statute must be equated with the privilege, although only recently the Court attributed to Congress a gratuitous grant of immunity where concededly the Constitution did not require it, under circumstances far less persuasive than the statutory language and the policy underlying it. See *United States* v. *Monia*, 317 U. S. 424.

---

[1] "A decision could be made either way without contradicting the express words of the act, or, possibly, even any very clear implication." Holmes, C. J., in *Hooper* v. *Bradford*, 178 Mass. 95, 97.

Instead of respecting "serious doubts of constitutionality" by giving what is at the least an allowable construction to the Price Control Act which legitimately avoids these doubts, the Court goes out of its way to make a far-reaching pronouncement on a provision of the Bill of Rights. In an almost cursory fashion, the Court needlessly decides that all records which Congress may require individuals to keep in the conduct of their affairs, because they fall within some regulatory power of Government, become "public records" and thereby, *ipso facto,* fall outside the protection of the Fifth Amendment that no person "shall be compelled in any criminal case to be a witness against himself."

In reaching out for a constitutional adjudication, especially one of such moment, when a statutory solution avoiding it lay ready at hand, the Court has disregarded its constantly professed principle for the proper approach toward congressional legislation. "When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell* v. *Benson,* 285 U. S. 22, 62, quoted by Mr. Justice Brandeis with supporting citations in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 348, n. 8. And see, generally, for duty to avoid constitutional adjudication, *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 568 *et seq.*

Departure from a basic canon of constitutional adjudication is singularly uncalled for in a case such as this, where the statute not only permits a construction avoiding constitutional considerations but on fair reading requires it.

In conferring powers of investigation upon the Administrator, Congress designed to secure the promptest dis-

closure of the books and records of the millions of private enterprises subjected to the regulations of the Office of Price Administration. It would contradict that vital aim to attribute to Congress the conflicting purpose of hampering the free flow of knowledge contained in businessmen's books by inviting controversies regarding still undetermined claims of privilege under the Fifth Amendment, in the absence of an expression of such purpose made much more manifest than the broad language of § 202 (g) which conferred immunity for the very purpose of avoiding such controversies.

It is a poor answer to say that if the statute were eventually found to confer immunity only to the extent required for supplying an equivalent for the constitutional privilege, all records would turn out to be unprivileged or would furnish immunity, and in either case refute any excuse for withholding them. Businessmen are not guided by such abstractions. Obedience is not freely given to uncertain laws when they involve such sensitive matters as opening the books of business. And so, businessmen would have had a strong incentive to hold back their records, forcing the Administrator to compel production by judicial process. Apart from the use of opportunities for obstructive tactics that can hardly be circumvented when new legislation is tested, delays inevitable to litigation would dam up the flow of needed information. Congress sought to produce information, not litigation. See *United States* v. *Monia, supra,* at p. 428.

In the *Monia* case the Court considered that the statute, "if interpreted as the Government now desires, may well be a trap for the witness." *Id.* at 430. We need not speculate here as to potential entrapment. The record discloses that the petitioner asked, through his attorney, whether he was "being granted immunity as to any and all matters for information obtained as a result of the investigation and examination of these records." On be-

half of the Price Administrator, the reply was "The witness is entitled to whatever immunity which flows as a matter of law from the production of these books and records which are required to be kept pursuant to MPRs [Maximum Price Regulations] 271 and 426." Petitioner, himself, thereupon specifically claimed immunity under the statute as well as under the Constitution, and stated that under "these conditions" he produced the books and records that the subpoena sought. It seems clear that disclosure was here made, records were produced, on the petitioner's justifiable belief—based upon the advice of counsel and acquiesced in by the presiding official—that he thereby secured statutory immunity and not constitutional litigation.

There is nothing to indicate that in 1942 Congress legislated with a view to litigating the scope of the limitation of the Fifth Amendment upon its powers. To ascertain what Congress meant by § 202 (g) we would do well to begin by carefully attending to what Congress said:

> "No person shall be excused from complying with any requirements under this section because of his privilege against self-incrimination, but the immunity provisions of the Compulsory Testimony Act of February 11, 1893 (U. S. C., 1934 edition, title 49, sec. 46), shall apply with respect to any individual who specifically claims such privilege." 56 Stat. 23, 30, 50 U. S. C. App. § 922 (g).

The text must be put into its context, not merely because one provision of a statute should normally be read in relation to its fellows, but particularly so here because Congress explicitly linked subsection (g) of § 202 to "any requirements under this section." Effective price control depended on unimpeded access to relevant information. To that end, § 202 authorized the Administrator to impose the "requirements" of the section, and those from whom

they were exacted were under duty of compliance by sub-section (e), while subsection (g) barred any excuse from compliance by a claim of privilege against self-crimination by the assurance of immunity from prosecution.[2]

---

[2] The entire § 202 of the Emergency Price Control Act of 1942, as amended, is as follows:

"(a) The Administrator is authorized to make such studies and investigations, to conduct such hearings, and to obtain such information as he deems necessary or proper to assist him in prescribing any regulation or order under this Act, or in the administration and enforcement of this Act and regulations, orders, and price schedules thereunder.

"(b) The Administrator is further authorized, by regulation or order, to require any person who is engaged in the business of dealing with any commodity, or who rents or offers for rent or acts as broker or agent for the rental of any housing accommodations, to furnish any such information under oath or affirmation or otherwise, to make and keep records and other documents, and to make reports, and he may require any such person to permit the inspection and copying of records and other documents, the inspection of inventories, and the inspection of defense-area housing accommodations. The Administrator may administer oaths and affirmations and may, whenever necessary, by subpena require any such person to appear and testify or to appear and produce documents, or both, at any designated place.

"(c) For the purpose of obtaining any information under subsection (a), the Administrator may by subpena require any other person to appear and testify or to appear and produce documents, or both, at any designated place.

"(d) The production of a person's documents at any place other than his place of business shall not be required under this section in any case in which, prior to the return date specified in the subpena issued with respect thereto, such person either has furnished the Administrator with a copy of such documents (certified by such person under oath to be a true and correct copy), or has entered into a stipulation with the Administrator as to the information contained in such documents.

"(e) In case of contumacy by, or refusal to obey a subpena served upon, any person referred to in subsection (c), the district court for any district in which such person is found or resides or transacts business, upon application by the Administrator, shall have juris-

Subsections (a), (b), (c) and (e) impose these four requirements: persons engaged in the vast range of business subject to the Act may be required to (1) make and keep records, (2) make reports and (3) permit the inspection and copying of records and other documents; such persons as well as others may be required to (4) "appear and testify or to appear and produce documents, or both, at any designated place." [3]   An unconstrained reading of subsection (g) insured prompt compliance with all these requirements by removing any excuse based on the privilege against self-crimination.

---

diction to issue an order requiring such person to appear and give testimony or to appear and produce documents, or both; and any failure to obey such order of the court may be punished by such court as a contempt thereof.   The provisions of this subsection shall also apply to any person referred to in subsection (b), and shall be in addition to the provisions of section 4 (a).

"(f) Witnesses subpenaed under this section shall be paid the same fees and mileage as are paid witnesses in the district courts of the United States.

"(g) No person shall be excused from complying with any requirements under this section because of his privilege against self-incrimination, but the immunity provisions of the Compulsory Testimony Act of February 11, 1893 (U. S. C., 1934 edition, title 49, sec. 46), shall apply with respect to any individual who specifically claims such privilege.

"(h) The Administrator shall not publish or disclose any information obtained under this Act that such Administrator deems confidential or with reference to which a request for confidential treatment is made by the person furnishing such information, unless he determines that the withholding thereof is contrary to the interest of the national defense and security.

"(i) Any person subpenaed under this section shall have the right to make a record of his testimony and to be represented by counsel." 56 Stat. 23, 30, as amended by § 105 of the Stabilization Extension Act of 1944, 58 Stat. 632, 637, 50 U. S. C. App. § 922.

[3] Technically there is an additional or fifth requirement—to furnish information "under oath or affirmation or otherwise"—but this requirement is really covered by the other four.

Here the Administrator required the petitioner to "keep and make available for examination by the Office of Price Administration . . . records of the same kind as he has customarily kept . . . ." § 14 (b), MPR 426, 8 F. R. 9546, 9549. The Government contends that because the records of petitioner's own business, those that he "customarily kept," were required to be so kept by the Administrator, he was compelled to disclose their contents even though they may have incriminated him, and that he was afforded no immunity under subsection (g) because he was not disclosing what were really his records. Surely this is to devitalize the phrase "any requirements under this section" if not to render it meaningless.

The Court supports this devitalization with the "short answer" that the immunity provided does cover compliance with *any* of these requirements as to which a person would have been excused from compliance because of his constitutional privilege. The short reply is that, bearing in mind the Court's conclusions as to the scope of the constitutional privilege, only the fourth requirement appears to be thus covered. I do not wish to lay too much stress on the Court's singular interpretation of the plural "requirements." Plainly, the Court construes § 202 (g) as according immunity only to oral testimony under oath and to the production of any documents which the Administrator did not have the foresight to require to be kept.[4]

The Court thus construes the words "complying with any requirements under this section" to read "appearing and testifying or producing documents other than those required to be kept pursuant to this section." Construc-

---

[4] The Administrator required this petitioner to keep "records of the same kind as he has customarily kept." § 14 (b) of Maximum Price Regulation No. 426, 8 Fed. Reg. 9546. As a practical matter, therefore, the statute as construed by the Court provides immunity only for compelled oral testimony.

tion, no doubt, is not a mechanical process and even when most scrupulously pursued by judges may not wholly escape some retrospective infusion so that the line between interpretation and substitution is sometimes thin. But there is a difference between reading what is and rewriting it. The Court here does not adhere to the text but deletes and reshapes it. Such literary freewheeling is hardly justified by the assumption that Congress would have so expressed it if it had given the matter attentive consideration.[5] In the *Monia* case the Court, having concluded that a similar question was present, had no difficulty in answering: "It is not for us to add to the legislation what Congress pretermitted." 317 U. S. at 430.

Both logic and authority, apart from due regard for our limited function, demonstrate the wisdom of respecting the text. The reach of the immunity given by § 202 (g) is spelled out in the incorporated terms of the Compulsory Testimony Act of 1893. These provide that where, as here, documentary evidence is exacted which may tend to incriminate, he who produces it shall not "be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise . . . ." 27 Stat. 443, 49 U. S. C. § 46. There is of course nothing in this provision to support the finespun exegesis which the Court puts upon § 202 (g). The Government admits as much by acknowledging that "the literal language of the Compulsory Testimony Act possibly may be so read" as to support the present claim of immunity. But it urges that nothing

---

[5] But cf. Carroll, Through the Looking Glass, c. 6:

" 'The question is,' said Alice, 'whether you *can* make words mean so many different things.'

" 'The question is,' said Humpty Dumpty, 'which is to be master—that's all.' "

44

in the "language or legislative history" of § 202 (g) requires a broader immunity than an adjudication of the scope of the constitutional privilege would exact.

The language yields no support for the Government's sophisticated reading adopted by the Court. Nor is there anything in the legislative history to transmute the clear import of § 202 into esoteric significance. So far as it bears upon our problem, the legislative history of the Act merely shows that § 202 in its entirety was included for the purpose of "obtaining information." [6] Nothing in that history throws any light upon the scope of the immunity afforded by subsection (g). [7] What is there in this silence of Congress that speaks so loudly to the Court? What are the "inescapable implications of the legislative history" that compelled its extraordinary reading of this statute? Surely, the fact that the Administrator's authority to require the keeping of records and the making of reports was stricken from the bill on its original passage through the House but was eventually

---

[6] See H. R. 5479, 77th Cong., 1st Sess., as introduced on August 1, 1941, in the House of Representatives and referred to the Committee on Banking and Currency, at p. 8; H. R. 5990, 77th Cong., 1st Sess., as reported out by the Committee on November 7, 1941, at p. 12 (at the conclusion of the hearings on H. R. 5479, the Committee directed its chairman to introduce this new bill representing the old bill as amended by the Committee in executive session; see H. R. Rep. 1409, 77th Cong., 1st Sess., p. 3) ; H. R. Rep. 1409, *supra,* at p. 9; 87 Cong. Rec. 9073, 9231; *id.* at 9232 (Wolcott amendment to strike out all of § 202 because previous amendment of the bill rendered this section for "obtaining information" redundant) ; *id.* at 9233 (Wolcott amendment adopted by the House) ; S. Rep. No. 931, 77th Cong., 2d Sess., p. 21 (H. R. 5990, as passed by the House, amended by reinstating § 202 for the purpose of "obtaining information") ; and see finally the Conference Report accompanying H. R. 5990, H. R. Rep. 1658, 77th Cong., 2d Sess., pp. 25–26 (agreeing to § 202).

[7] Indeed, the only reference to the immunity provision in the legislative documents, see footnote 6 *supra,* consists merely of practically verbatim repetitions of the provision.

reinserted, merely indicates that Congress finally concluded that obtaining information was necessary for effective price regulation.[8]

But the Court reads into § 202 (g) the meaning that "they" put upon the record-keeping provisions that Congress thus reinserted into the bill. "They," the "general Counsel for the OPA," appeared and testified orally at the Senate Hearings [9] and, in urging restoration of the licensing (§ 205 (f)) and record-keeping provisions, secured permission to file various briefs and documents with the Committee.[10] While there is nothing in the General Counsel's oral testimony that sheds light upon our prob-

---

[8] The House originally struck out the entire § 202 because a previously adopted amendment had made the section "redundant." 87 Cong. Rec. 9232–9233. The previously adopted amendment had inserted a § 203 (a) which simply provided that:

"The Administrator and the Board of Administrative Review or any member or commissioner thereof may administer oaths and affirmations, may require by subpena or otherwise the attendance and testimony of witnesses and the production of documents at any designated place. No person shall be excused from complying with any requirements under this section because of his privilege against self-incrimination, but the immunity provisions of the Compulsory Testimony Act of February 11, 1893 (U. S. C., 1934 ed., title 49, sec. 46), shall apply with respect to any individual who specifically claims such privilege." Id. at 9226.

As passed by the House, then, the bill would have authorized the Administrator to require the production of the records here in issue, but there would have been no question of their being "public" records, and petitioner would clearly have been accorded the immunity herein claimed. The House Managers yielded as to the record-keeping requirements and the reinstatement of the entire § 202, but there is no mention in their report of the provisions of subsection (g), let alone any indication that there was any difference intended in the scope of the immunity accorded by the two bills.

[9] Hearings before the Senate Committee on Banking and Currency on H. R. 5990, 77th Cong., 1st Sess., at pp. 68–71, 112–23, 144–60, 174–81, 550–53.

[10] Id. at 154, 175, 180–81.

lem, it does appear from one of the exhibits filed by him that the Court has correctly determined the far-reaching construction that *he* had given to provisions which the House had rejected as "redundant."[11] But our task is to determine, as best we can, what Congress meant—not what counsel sponsoring legislation, however disinterestedly, hoped Congress would mean. If counsel's views had been orally expressed to the Committee,[12] the Committee might have given some indication of its views. But even if upon such disclosure of counsel's views the Committee had remained silent, this would hardly have furnished sufficient evidence to transmute the language that Congress actually employed to express its meaning into some other meaning.

To attribute to Congress familiarity with, let alone acceptance of, a construction solely by reason of the fact that our research reveals its presence among the 60,000-word memoranda which the Chairman of the Senate Committee permitted the General Counsel of the O. P. A. to file, is surely to defy the actualities of the legislative process. Is there the slenderest ground for assuming that members of the Committee read counsel's submission now relied upon by the Court? There is not a reference to the contentions of the O. P. A., wholly apart from that brief, in any report of a committee of either House or in any utterance on the floor of either House.[13] The fact

---

[11] See footnote 8 *supra.*

[12] Every reference in the Court's opinion to p. 181 *et seq.* of the hearings is to the General Counsel's brief—an exhibit—not to oral testimony.

[13] I do not dispute either (a) that the hearings (including the brief as an *exhibit* thereto) were printed and available before the Senate passed the bill, or (b) that there is a possibility that a curious Senator (but not a Representative) might have read all this fine print. I mean merely to suggest (a) that in view of the times, the typography, and the length of the text, the chances are remote, and (b) that in view of the importance of the issue it is indeed a hazardous matter

of the matter is that the House had passed the measure before the brief, in type smaller than that of the footnotes in this opinion, appeared in a volume of hearings com-

to attribute positive congressional meaning to such an improbable source. While it may be presumed that the Senate subcommittee revised the House bill "in the light of the hearings," all that means is that they heard what they heard—it does not mean that they read everything they·might have read. It would be enough to attribute to a diligent committeeman familiarity with transcribed oral testimony of such volume as that on this bill. But cf. *id*. at 15: "Senator BARKLEY. Mr. Chairman, none of us have read the hearings in the House—or maybe a few of us have"; *id*. at 26: "Senator TAFT. I have not read the House hearings, I am ashamed to say."

On January 26, 1942, Representative Gifford stated on the floor of the House:

"But this licensing business, 'Compulsory loyalty will crack sooner than the genuine kind.' During the last World War it was loyalty by cooperation. They had licensing, yes, on food products and on fuel, but little of anything else. If the licensee was punished, it was only a slap on the wrist. If he would contribute to the Red Cross he was forgiven. I have a compiled brief on the licensing methods that I could go into at length. An hour would be necessary to properly discuss it and to recite the experiences of ours and other nations. Canada now has it. Let me read to you their statement of policy. These restrictions are not designed to curtail business operations in any way. But by placing every person who in any way handles the commodities named in the order under license, the Board will have the machinery with which to make speedy checks on available stocks and to police more effectively any price-fixing order which may be instituted." (88 Cong. Rec. 672.)

To trace knowledge of the O. P. A. brief to a congressional reader by assuming from this statement that Representative Gifford, who opposed the adoption of these provisions of the bill, was such a reader, and from that to attribute to Congress knowledge of what was in an exhibit to a committee hearing, is so attenuated a process of inferential reasoning as to discredit the whole paraphernalia of legislative history. That the Congress itself does not care to be charged with knowledge of all the extraneous matter for which either House has granted leave to print in the Record is apparent from the rules of the Joint Committee on Printing providing that "the same shall be published in the Appendix" and "in 6½-point type." See Cong. Rec.,

48

prising 560 pages (part of the three volumes of House and Senate Hearings containing 2,865 pages). The Government, in submitting to us the legislative history of the immunity provision with a view to sustaining its claims, did not pretend that the Congress was either aware of the brief or accepted the construction it proffered. The suggestion that members of a congressional committee have read, and presumptively agreed with, the views found in a memorandum allowed to be filed by a witness and printed in appendix form in the hearings on a bill, let alone that both Houses in voting for a measure adopted such views as the gloss upon the language of the Act which it would not otherwise bear, can only be made in a Pickwickian sense. It is hard to believe that even the most conscientious members of the Congress would care to be charged with underwriting views merely because they were expressed in a memorandum filed as was the O. P. A. brief, on which so much reliance is placed in the Court's opinion. If the language of a statute is to be subjected to the esoteric interpretative process that the suggested use of the O. P. A. brief implies, since it is the common practice to allow memoranda to be submitted to a committee of Congress by interests, public and private, often high-minded enough but with their own axes to grind, great encouragement will be given to the temptations of administrative officials and others to provide self-serving "proof" of congressional confirmation for their private views through incorporation of such materials. Hitherto unsuspected opportunities for assuring desired

Dec. 11, 1947, p. A5039. There is, moreover, little basis for concluding that the Gifford "compiled brief" was the O. P. A. brief—different briefs frequently quote from the same authority. On the contrary, the O. P. A. brief hardly presented the argument that "Compulsory loyalty will crack sooner than the genuine kind," nor did it contain material demonstrating either the narrow scope or the weaknesses of World War I licensing.

glosses upon innocent-looking legislation would thus be afforded.

We agree with the Government that Congress gave the Administrator broad powers for obtaining information as an aid to the administration and enforcement[14] of the Act, and that "The immunity provision of Section 202 (g) was inserted to insure a full exercise of these powers unhampered by the assertion of the privilege against self-incrimination." Certainly. But how does it follow that Congress thereby intended *sub silentio* to effectuate this broad purpose by confining the immunity accorded within the undefined controversial scope of the Fifth Amendment? One would suppose that Congress secured its object, as this Court held in the *Monia* case, by giving immunity and so taking away contentions based on the constitutional privilege.

Plainly, it would have sufficed to dispose of the present controversy by holding that Congress granted immunity by § 202 (g) to persons who produced their own records, as were the records in this case, and not in their possession as custodians of others, even though required to be kept by § 202. To adapt the language of Mr. Justice Holmes, words have been strained by the Court more than they

---

[14] Putting the word "enforcement" in § 202 (a) in italics does little to solve our problem of statutory construction—for *enforcement* means enforcement. The word is hardly enervated by the extension of immunity to the person compelled to disclose his books and records. The information thus obtained might well assist the Administrator in the enforcement of the Act against the suppliers of, buyers from, or competitors of the owner of the records. As to his suppliers, the records would of course disclose compliance with maximum price regulations; as to the buyers, many regulations established maximum price on a cost-plus basis and the information obtained would be essential to proof of violation; as to the competitors, many regulations established maximum price for new sellers on the basis of their closest competitors, and here again the information obtained might well be essential to the enforcement of the Act.

50

should be strained in order to reach a doubtful constitutional question.   See Blodgett v. Holden, 275 U. S. 142, 148.

And so we come to the Court's facile treatment of the grave constitutional question brought into issue by its disposition of the statutory question.   In the interest of clarity it is appropriate to note that the basic constitutional question concerns the scope of the Fifth Amendment, not the validity of the Price Control Act. The Court has construed the immunity afforded by § 202 (g) of the Act as co-extensive with the scope of the constitutional privilege against self-incrimination. Thus construed, the subsection is of course valid, since, by hypothesis, it affords a protection as broad as the Fifth Amendment.   Counselman v. Hitchcock, 142 U. S. 547; Brown v. Walker, 161 U. S. 591.   The vice of this construction—and the importance of the point warrants its reiteration—is precisely that it necessitates interpretation of the Constitution instead of avoiding it.[15]   And if the precedents mean anything this course will be followed in every future case involving a question of statutory immunity.

The Court hardly finds a problem in disposing of an issue far-reaching in its implications, involving as they do a drastic change in the relations between the individual and the Government as hitherto conceived.   The Court treats the problem as though it were almost self-evident that when records are required to be kept for some needs of Government, or to be kept in a particular form, they are legally considered governmental records and may be demanded as instruments of self-crimination.

Ready-made catch-phrases may conceal but do not solve serious constitutional problems.   "Too broadly gen-

---

[15] Needless to say, the constitutionality of the Fifth Amendment is not raised!

eralized conceptions are a constant source of fallacy." Holmes, J., in *Lorenzo* v. *Wirth,* 170 Mass. 596, 600. Here the fallacy can be traced to the rephrasing of our problem into terms "to which as lawyers the judges have become accustomed," *ibid.;* then, by treating the question as though it were the rephrased issue, the easy answer appears axiomatic and, because familiar, authoritative. Subtle question-begging is nevertheless question-begging. Thus: records required to be kept by law are public records; public records are non-privileged; required records are non-privileged.

If records merely because required to be kept by law *ipso facto* become public records, we are indeed living in glass houses. Virtually every major public law enactment—to say nothing of State and local legislation—has record-keeping provisions. In addition to record-keeping requirements, is the network of provisions for filing reports. Exhaustive efforts would be needed to track down all the statutory authority, let alone the administrative regulations, for record-keeping and reporting requirements. Unquestionably they are enormous in volume.

The Congress began its history with such legislation. Chapter I of the Laws of the First Session of the First Congress—"An Act to regulate the Time and Manner of administering certain Oaths"—contained a provision requiring the maintenance of records by persons administering oaths to State officials. 1 Stat. 23, 24. Chapter V—"An Act to regulate the Collection of the Duties imposed by law on the tonnage of ships or vessels, and on goods, wares and merchandise imported into the United States"—contained a provision requiring an importer to produce the original invoice and to make a return concerning the consigned goods with the collector of the port of arrival. 1 Stat. 29, 39–40.

Every Congress since 1789 has added record-keeping and reporting requirements. Indeed, it was the plethora

of such provisions that led President Roosevelt to establish the Central Statistical Board in 1933 and induced the enactment, in 1942, of the Federal Reports Act, 56 Stat. 1078. See, generally, Report of the Central Statistical Board, H. Doc. No. 27, 76th Cong., 1st Sess.; Centralization and Coordination of Federal Statistics—Report to the Committee on Appropriations of the House of Representatives, December 4, 1945, 91 Cong. Rec. A5419. On April 25, 1939, the Central Statistical Board reported that, "Since the end of 1933, the Board has reviewed in advance of dissemination more than 4,600 questionnaires and related forms and plans proposed for use by Federal agencies. The records for the past 2 years show that the Board has received forms from 52 Federal agencies and a number of temporary interdepartmental committees." See Hearings before the House Committee on Expenditures in the Executive Departments on H. R. 5917, 76th Cong., 1st Sess., at p. 32. The Board, on the basis of a comprehensive survey of the financial and other reports and returns made to 88 Federal agencies by private individuals, farms, and business concerns during the fiscal year ending June 30, 1938, informed Congress as follows:

> "Counting both the administrative and the nonadministrative reports and returns, the Board's inquiry revealed that some 49,000,000 of the total during the year were collected in accordance with statutory provisions specifically authorizing or directing the collection of reports of the types called for. Approximately 55,000,000 returns were collected by agencies in connection with their performance of functions which were specifically authorized by statutes, although the statutes did not specify the reports. In such cases the information sought was obviously necessary in carrying out the required functions. Nearly 27,000,000 returns were collected by

Federal agencies on report forms for each of which the legal authority was too general or too indefinite to permit its clear definition. The remaining 5,000,000 returns were made under a variety of types of legal authorities including authorizations implied in appropriations made specifically to support the collection of the reports.

"Somewhat less than half of the returns made to Federal agencies on all forms . . . were mandatory by law, in the sense that a penalty is prescribed in case of failure of the respondent to file a required report. Some of these mandatory returns are very elaborate, and as a consequence over 60 percent of the total number of answers on report forms, other than applications, were in accordance with mandatory requirements." (H. Doc. No. 27, *supra,* at 11–12.)

I do not intend by the above exposition to cast any doubt upon the constitutionality of the record-keeping or reporting provisions of the Emergency Price Control Act or, in general, upon the vast number of similar statutory requirements. Such provisions serve important and often indispensable purposes. But today's decision can hardly fail to hamper those who make and those who execute the laws in securing the information and data necessary for the most effective and intelligent conduct of Government.

The underlying assumption of the Court's opinion is that all records which Congress in the exercise of its constitutional powers may require individuals to keep in the conduct of their affairs, because those affairs also have aspects of public interest, become "public" records in the sense that they fall outside the constitutional protection of the Fifth Amendment. The validity of such a doctrine lies in the scope of its implications. The claim touches records that may be required to be kept by fed-

eral regulatory laws, revenue measures, labor and census legislation in the conduct of business which the understanding and feeling of our people still treat as private enterprise, even though its relations to the public may call for governmental regulation, including the duty to keep designated records.

If the records in controversy here are in fact *public,* in the sense of publicly owned, or governmental, records, their non-privileged status follows. See *Davis* v. *United States,* 328 U. S. 582, 594, 602 (dissenting opinion). No one has a private right to keep for his own use the contents of such records. But the notion that whenever Congress requires an individual to keep in a particular form his own books dealing with his own affairs his records cease to be his when he is accused of crime, is indeed startling.

A public record is a public record. If the documents in controversy are "public records" and as such non-privileged in a prosecution under the Price Control Act, why are they not similarly public and non-privileged in any sort of legal action? There is nothing in either the Act or the Court's construction of it to qualify their "public" nature. Is there any maintainable reason why the Fifth Amendment should be a barrier to their utilization in a prosecution under any other law if it is no barrier here? These records were, as a matter of fact, required to be kept (and hence "public") quite apart from this Act. See Int. Rev. Code § 54 (a) and Treas. Reg. 111, § 29.54–1. If an examination of the records of an individual engaged in the processing and sale of essential commodities should disclose non-essential production, for example, why cannot the records be utilized in prosecutions for violations of the priorities or selective service legislation? Cf. *Harris* v. *United States,* 331 U. S. 145; but cf. *Trupiano* v. *United States,* 334 U. S. 699.

Moreover, the Government should be able to enter a man's home to examine or seize such public records, with

or without a search warrant, at any time. If an individual should keep such records in his home, as millions do, instead of in his place of business, why is not his home for some purposes and in the same technical sense, a "public" library? Compare *Davis* v. *United States,* 328 U. S. 582, and *Harris* v. *United States, supra,* with the "well-stated" opinion in *United States* v. *Mulligan,* 268 F. 893; but see *Trupiano* v. *United States, supra.* This is not "a parade of horribles." If a man's records are "public" so as to deprive him of his privilege against self-crimination, their publicness inheres in them for many other situations.

Indeed, if these records are public, I can see no reason why the public should not have the same right that the Government has to peruse, if not to use, them. For, public records are "of a public character, kept for public purposes, and so immediately before the eyes of the community that inaccuracies, if they should exist, could hardly escape exposure." *Evanston* v. *Gunn,* 99 U. S. 660, 666. It would seem to follow, therefore, that these public records of persons engaged in what to the common understanding is deemed private enterprise should be generally available for examination and not barred by the plea that the enterprise would thereby cease to be private.

Congress was guilty, perhaps, of no more than curious inconsistency when it provided in § 202 (h) of the Act for the confidential treatment of these "public" records.[16] But the seeming inconsistency generally applies to

---

[16] For the text of § 202 (h) see note 2 *supra.* H. R. 5479 as originally introduced (see note 6 *supra*) would have left it to the Administrator to determine whether the information obtained should be deemed confidential. The bill was changed by the House Committee to its final form whereby the person furnishing the information could request confidential treatment so as to give such persons "further protection." H. R. Rep. 1409, 77th Cong., 1st Sess., p. 9. "Further" meant *in addition to* the statutory immunity afforded by § 202 (g)! *Ibid.*

information obtained by the Government pursuant to record-keeping and reporting requirements. See H. Doc. No. 27, *supra,* at pp. 26–28; 56 Stat. 1078, 1079; H. R. Rep. No. 1651, 77th Cong., 2d Sess., at pp. 4–5; ("We [the Bureau of the Census] do not even supply the Department of Justice or anybody else with that information") Hearings before the House Committee on Expenditures in the Executive Departments on H. R. 7590, 74th Cong., 1st Sess., at p. 63.

The fact of the matter, then, is that records required to be kept by law are not necessarily public in any except a word-playing sense. To determine whether such records are truly public records, *i. e.,* are denuded of their essentially private significances, we have to take into account their custody, their subject matter, and the use sought to be made of them.

It is the part of wisdom, particularly for judges, not to be victimized by words. Records may be public records regardless of whether "a statute requires them to be kept," if "they are kept in the discharge of a public duty" either by a public officer or by persons acting under his direction. *Evanston* v. *Gunn, supra.* Chapter I of the first statute passed by Congress, *supra,* is an example of an act requiring a *public* record to be kept.

Records do not become public records, however, merely because they are required to be kept by law. Private records under such circumstances continue to be private records. Chapter V of the Acts of the First Congress, *supra,* is an example of such a *private* record required to be kept by law.

Is there, then, any foundation for the Court's assumption that *all* records required to be kept by law are public and not privileged? Reliance is placed on language in *Wilson* v. *United States,* 221 U. S. 361. The holding in that case has no real bearing on our problem. Wilson, the president of a corporation, in answer to a subpoena

to produce, refused to surrender the corporation's books and records on the ground that their contents would tend to incriminate him. He appealed to this Court from a judgment committing him for contempt. The case was disposed of on the ground that the books were the corporation's and not "his private or personal books," that the "physical custody of incriminating documents does not of itself protect the custodian against their compulsory production," and that, therefore, "the custodian has no privilege to refuse production although their contents tend to criminate him." 221 U. S. at 378, 380, 382. The Court concluded as follows:

"The only question was whether as against the corporation the books were lawfully required in the administration of justice. When the appellant became president of the corporation and as such held and used its books for the transaction of its business committed to his charge, he was at all times subject to its direction, and the books continuously remained under its control. If another took his place his custody would yield. He could assert no personal right to retain the corporate books against any demand of government which the corporation was bound to recognize.

"We have not overlooked the early English decisions to which our attention has been called . . . but these cannot be deemed controlling. The corporate duty, and the relation of the appellant as the officer of the corporation to its discharge, are to be determined by our laws. Nothing more is demanded than that the appellant should perform the obligations pertaining to his custody and should produce the books which he holds in his official capacity in accordance with the requirements of the subpoena. None of his personal papers are subject to inspection under the writ and his action, in refusing to permit the

examination of the corporate books demanded, fully warranted his commitment for contempt." (221 U. S. at 385–86.)

The *Wilson* case was correctly decided. The Court's holding boiled down to the proposition that "what's not yours is not yours." It gives no sanction for the bold proposition that Congress can legislate private papers in the hands of their owner, and not in the hands of a custodian, out of the protection afforded by the Fifth Amendment. Even if there were language in the *Wilson* opinion in that direction, an observation taken from its context would seem to be scant justification for resolving, and needlessly, "a very grave question of constitutional law, involving the personal security, and privileges and immunities of the citizen." *Boyd* v. *United States,* 116 U. S. 616, 618.

The conclusion reached today that *all* records required to be kept by law are *public* records cannot lean on the *Wilson* opinion. This is the language relied upon by the Court:

"The principle [that a *custodian* has no privilege as to the documents in his *custody*] applies not only to public documents in public offices, but also to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation and the enforcement of restrictions validly established. There the privilege, which exists as to private papers, cannot be maintained." (221 U. S. at 380.)

But Mr. Justice Hughes, the writer of the *Wilson* opinion, went on to note that "There are abundant illustrations in the decisions" of this principle that a custodian has no privilege as to the documents in his custody just as no one has a privilege as to public or official records because they are not his private papers. He resorted

to these illustrations concerning custodians because the dissenting opinion of Mr. Justice McKenna, while accepting the premise that public records were not privileged, quarreled with the Court's holding as to the absence of a custodian's privilege concerning non-public records, as follows: "As the privilege is a guaranty of personal liberty it should not be qualified by construction and a distinction based on the ownership of the books demanded as evidence is immaterial. Such distinction has not been regarded except in the case of public records, as will be exhibited by a review of the authorities." 221 U. S. at 388.

The illustrations utilized by Mr. Justice Hughes to meet this challenge raised by the dissent stand for the propositions that (a) a custodian has no privilege, and (b) public documents and records are non-privileged, but not at all on any notion that private records required to be kept by law are "public" records. Before analyzing the eleven precedents or illustrations thus employed, it is worthy of note that the illustrations were derived from the Government's brief. It is significant that that brief, by Solicitor General Frederick W. Lehmann, well-known for his learning, contained no reference to the "required records" doctrine. On the contrary the Government cited these cases to support its argument that: "The immunity granted by the Constitution is purely personal." [17]

These are the "illustrations in the decisions":

(1) *Bradshaw* v. *Murphy*, 7 C. & P. 612, where "it was held that a vestry clerk who was called as a witness could not on the ground that it might incriminate himself object to the production of the vestry books kept under the statute, 58 George III, chapter 69, § 2." (221 U. S. at 380.)

---

[17] See summary of argument for the United States, 221 U. S. at 366. The Lehmann Brief deserves reading.

*Comment.*—This is an instance where records were required to be kept by a public officer (for such, in England, was a parish vestry clerk). Clearly the clerk had no privilege as to such records since (1) they were not his, he was merely their custodian, and (2) he was a public officer.

(2) *State* v. *Farnum*, 73 S. C. 165, where it was held that the dispenser of the State Dispensary had to disclose to a legislative committee the official books of that State institution.

*Comment.*—Under South Carolina law the dispenser was an officer of the State; the books were true public records; he was their custodian.

(3) *State* v. *Donovan*, 10 N. D. 203, where it was held that a register of sales of intoxicating liquor kept by a druggist pursuant to a statute providing that such record "shall be open for the inspection of the public at all reasonable times during business hours, and any person so desiring may take memoranda or copies thereof" was a public record.

*Comment.*—The State court construed the statute to make the druggist a public officer and, as such, the custodian of the register for the State. The court quoted authority to the effect that the register was "the property of the state, and not of the citizen, and is in no sense a private memorandum." 10 N. D. at 209. Are we to infer from the Court's opinion in this case that the books and records petitioner customarily kept were not his property but that of the United States Government, and that they "shall be open for the inspection of the public at all reasonable times during business hours, and any person so desiring may take memoranda or copies thereof"? *Ibid.* and cf. *Evanston* v. *Gunn, supra.*

(4) *State* v. *Davis*, 108 Mo. 666, where it was held that a druggist had no privilege as to the prescriptions he filled for sales of intoxicating liquor.

*Comment.*—Here the prescriptions were "required to be kept by law" but they constituted "public" records in the pure *Wilson* sense. The prescriptions belonged to the physicians or their patients, "and the druggist [was] merely their custodian." 108 Mo. at 671.

(5) *State* v. *Davis,* 68 W. Va. 142 (prescription-keeping case virtually identical with *State* v. *Davis,* 108 Mo. 666).

(6) *People* v. *Coombs,* 158 N. Y. 532, where it was held that a coroner had no privilege as to official inquest records, required to be filed with the county clerk, over his contention that they were private records because they were false and had been found in his own office.

*Comment.*—"The papers were in a public office, in the custody of a clerk who was paid by the city. On their face they were public records and intended to be used as such." 158 N. Y. at 539.

(7) *L. & N. R. Co.* v. *Commonwealth,* 51 S. W. (Ky.) 167, where it was held that a railroad corporation had no privilege as to a tariff sheet.

*Comment.*—The tariff sheet was "required by law to be publicly posted at the station, and was in fact so posted." 51 S. W. at 167. Petitioner is not a railroad corporation and his records were not "publicly posted."

(8) *State* v. *Smith,* 74 Iowa 580, where it was held that a pharmacist had no privilege as to the monthly reports of liquor sales that he had made to the county auditor pursuant to a statutory reporting requirement.

*Comment.*—The reports in the auditor's office were "public records of the office, which are open to the inspection of all, and may be used in evidence in all cases between all parties, when competent, to establish any fact in issue for judicial determination." 74 Iowa at 583–84. Petitioner's records were in his possession and were not open for public inspection.

(9) *State* v. *Cummins,* 76 Iowa 133 (same as *State* v. *Smith, supra*).

(10) *People* v. *Henwood,* 123 Mich. 317 (liquor sales reporting requirement held valid).

(11) *Langdon* v. *People,* 133 Ill. 382, held that seizure pursuant to search warrant of official State documents unlawfully in appellant's possession constituted reasonable search—"They were not private papers." 133 Ill. at 398.

In summary of the authorities cited as illustrations of the principle recognized and applied by the Court in the *Wilson* case, then, it should be obvious that they neither stand for the proposition that the fact that private records are required to be kept by statute makes them public records by operation of law, nor did Mr. Justice Hughes misconstrue them in reaching the decision in the *Wilson* case.

Were there any doubt as to the point of the illustrations in the *Wilson* case, surely we could safely permit that doubt to be resolved by the *Wilson* opinion itself. After reviewing the illustrative cases, Mr. Justice Hughes observed:

> "The fundamental ground of decision in this class of cases, is that where, by virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the demanding authority, the custodian has no privilege to refuse production although their contents tend to criminate him. In assuming their custody he has accepted the incident obligation to permit inspection." (221 U. S. 381–82.)

Evidently the dictum in the *Wilson* case and the authorities therein cited need to be bolstered for the use to which they are put in this case. We are told that "Other state supreme court decisions, subsequent to the

*Wilson* case, similarly treat as non-privileged, records required by statute to be kept." These are the five instances cited:

(1) *Paladini* v. *Superior Court,* 178 Cal. 369, where it was held that the statutory procedure whereby the State Market Director could compel the production of the sales records of licensed fish dealers was valid.

*Comment.*—The court did not hold that the records were "non-privileged," but disposed of the contention that the statute violated the constitutional privilege against self-incrimination on the ground that "The proceeding before the state market director is not criminal in its nature, and the order compelling the petitioners to produce their books before the state market director was not in violation of the constitutional provision which prohibits a court or officer from requiring a defendant in a criminal case to furnish evidence against himself." 178 Cal. at 373. The court did dispose of the contention that the statute violated the Fourth Amendment of the United States Constitution on the ground that the records were not private. But the records here were public records because, since it was conceded that the fish belonged to the State, "They contain a record of the purchase and sale of the property of the state, by those having a qualified or conditional interest therein." *Ibid.* There is no suggestion in this case that petitioner's records were public records because his fruit and vegetables were the property of the United States Government.

(2) *St. Louis* v. *Baskovitz,* 273 Mo. 543, where a municipal ordinance requiring junk dealers to keep books of registry recording their purchases and providing that the books be open for inspection and examination by the police *or any citizen* was upheld against the contention that it violated the State constitutional provision against unreasonable searches and seizures *for private purposes.*

*Comment.*—The case was disposed of by the court's interpretation of the words "any citizen" as being limited in meaning to "one whose property has been stolen." 273 Mo. at 576. The records here were "required to be kept by statute," it is true, but the court had no occasion to, and did not, go into the question as to whether the records were "non-privileged."

(3) *State* v. *Legora,* 162 Tenn. 122, where a statute requiring junk dealers to keep a record of their purchases was upheld.

*Comment.*—A record which "shall at all times be open to the inspection of . . . any person who may desire to see the same," 162 Tenn. at 124, is, of course, a "public" record. *Evanston* v. *Gunn, supra;* cf. *St. Louis* v. *Baskovitz, supra.*

(4) *State* v. *Stein,* 215 Minn. 308, where a statute requiring licensed dealers in raw furs to keep records of their sales and purchases was upheld.

*Comment.*—The records here were public records for the same reason that the records involved in the *Paladini* case were public records—"the state is the owner, in trust for the people, of all wild animals." 215 Minn. at 311.

(5) *Financial Aid Corporation* v. *Wallace,* 216 Ind. 114, where a statute requiring licensed small loan concerns to keep records and providing for their inspection by the State Department of Financial Institutions was upheld.

*Comment.*—The court had no occasion to, and did not, go into the question as to whether the records were either "public" or "non-privileged."

It appears to me, therefore, that the authorities give no support to the broad proposition that because records are required to be kept by law they are public records and, hence, non-privileged. Private records do not thus

become "public" in any critical or legally significant sense; they are merely the records of an industry or business regulated by law. Nor does the fact that the Government either may make, or has made, a license a prerequisite for the doing of business make them public in any ordinary use of the term. While Congress may in time of war, or perhaps in circumstances of economic crisis, provide for the licensing of every individual business, surely such licensing requirements do not remove the records of a man's private business from the protection afforded by the Fifth Amendment. Even the exercise of the war power is subject to the Fifth Amendment. See, *e. g., Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 155–56. Just as the licensing of private motor vehicles does not make them public carriers, the licensing of a man's private business, for tax or other purposes, does not under our system, at least so I had supposed, make him a public officer.

Different considerations control where the business of an enterprise is, as it were, the public's. Clearly the records of a business licensed to sell state-owned property are public records. Cf., *e. g., Paladini* v. *Superior Court, supra; State* v. *Stein, supra.* And the records of a public utility, apart from the considerations relevant to corporate enterprise, may similarly be treated as public records. Cf., *e. g., L. & N. R. Co.* v. *Commonwealth, supra; Financial Aid Corporation* v. *Wallace, supra.* This has been extended to the records of "occupations which are *malum in se,* or so closely allied thereto, as to endanger the public health, morals or safety." *St. Louis* v. *Baskovitz, supra,* at p. 554; cf., *e. g., State* v. *Legora, supra; State* v. *Donovan, supra; State* v. *Smith, supra.*

Here the subject matter of petitioner's business was not such as to render it public. Surely, there is nothing inherently dangerous, immoral, or unhealthy about the

sale of fruits and vegetables. Nor was there anything in his possession or control of the records to cast a cloud on his title to them. They were the records that he customarily kept. I find nothing in the Act, or in the Court's construction of the Act, that made him a public officer. He was being administered, not administering. Nor was he in any legitimate sense of the word a "custodian" of the records. I see nothing frivolous in a distinction between the records of an "unincorporated entrepreneur" and those of a corporation. On the contrary, that distinction was decisive of the *Wilson* holding:

> "But the corporate form of business activity, with its chartered privileges, raises a distinction when the authority of government demands the examination of books." (221 U. S. at 382.)

And the Court quoted at length from *Hale* v. *Henkel*, 201 U. S. 43, 74–75:

> " '. . . we are of the opinion that there is a clear distinction in this particular between an individual and a corporation, and that the latter has no right to refuse to submit its books and papers for an examination at the suit of the State. The individual may stand upon his constitutional rights as a citizen. He is entitled to carry on his private business in his own way. His power to contract is unlimited. He owes no duty to the State or to his neighbors to divulge his business, or to open his doors to an investigation, so far as it may tend to criminate him. . . .
>
> " 'Upon the other hand, the corporation is a creature of the State. It is presumed to be incorporated for the benefit of the public. It receives certain special privileges and franchises . . . .' " (221 U. S. at 383.)

The distinction between corporate and individual enterprise is one of the deepest in our constitutional law, as it is for the shapers of public policy.

The phrase "required to be kept by law," then, is not a magic phrase by which the legislature opens the door to inroads upon the Fifth Amendment. Statutory provisions similar to § 202 (b) of this Act, requiring the keeping of records and making them available for official inspection, are constitutional means for effective administration and enforcement.[18] It follows that those charged with the responsibility for such administration and enforcement may compel the disclosure of such records in conformity with the Fourth Amendment. See *Boyd* v. *United States, supra,* at pp. 623–24. But it does not follow that such disclosures are beyond the scope of the protection afforded by the Fifth Amendment. For the compulsory disclosure of a man's "private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom." *Id.* at 632.

The Court in the *Boyd* case was fully cognizant of the sense and significance of the phrase "books required by law to be kept for their inspection." *Id.* at 623–24. Surely the result of that decision, if not the opinion itself, speaks loudly against the claim that merely by virtue of a record-keeping provision the constitutional privilege against self-incrimination becomes inoperative. The document in controversy in the *Boyd* case was historically, and as a matter of fact, much more of a "required record" than the books and records the petitioner here "cus-

[18] See note 14 *supra.*

68

tomarily kept." If the Court's position today is correct the *Boyd* case was erroneously decided.[19]

---

[19] The Boyds had contracted to supply plate glass to the Government on a duty-free price basis. They contended that they had fulfilled this contract out of their stock on hand. They had previously secured a free entry of 29 cases of plate glass and claimed that this shipment replaced *in part* the glass that they had furnished the Government; the Government asserted that that shipment contained more than the amount of the glass furnished. After the Boyds had secured a free permit and entry of a second shipment of 35 cases of plate glass, but before delivery to them, the goods were seized and the free permit was revoked. In the proceedings for the forfeiture of the 35 cases, the Government, pursuant to the statutory procedure held unconstitutional by the Court, sought and secured production from the Boyds of the invoice covering the first shipment of the 29 cases. This invoice was a "record required to be kept by statute." The Act of July 31, 1789, required the importer to make an official entry with the collector at the port of arrival and there produce the original invoice to the collector. 1 Stat. 29, 39–40; as amended by the Act of August 4, 1790, 1 Stat. 145, 161–62; as amended by the Act of March 2, 1799, 1 Stat. 627, 655–56 (invoice must be signed by collector; and see form of oath required to accompany invoice) ; as amended by the Act of April 20, 1818, 3 Stat. 433, 434, 436; as amended by the Act of March 1, 1823, 3 Stat. 729–30 (no entry without invoice unless importer gives bond to secure production of invoice within stated period), 737 (invoice, certified with collector's official seal, conclusive evidence of value of imported goods in any court of the United States) ; as amended by the Act of August 30, 1842, 5 Stat. 548, 564–65 (collector authorized to examine any importer and to require production of invoices) ; as amended by the Act of March 3, 1863, 12 Stat. 737–38 (required invoices to be in triplicate and indorsed prior to shipment to this country by a consular officer who "shall deliver to the person producing the same one of said triplicates, to be used in making entry of said goods, wares, or merchandise; shall file another in his office, to be there carefully preserved; and shall, as soon as practicable, transmit the remaining one to the collector of the port of the United States at which it shall be declared to be the intention to make entry of said goods, wares, or merchandise"), 740 (penalty for wilful destruction or concealment of invoices) and (district judge where it appears to his satisfaction that fraud on revenue has been committed or attempted shall authorize collector to seize invoices) ; as amended

In disregarding the spirit of that decision, the Court's opinion disregards the clarion call of the *Boyd* case: *obsta principiis*. For, while it is easy enough to see this as a petty case and while some may not consider the rule of law today announced to be fraught with unexplored significance for the great problem of reconciling individual freedom· with governmental strength, the *Boyd* opinion admonishes against being so lulled. "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance." *Id.* at 635.

Violators should be detected, tried, convicted, and punished—but not at the cost of needlessly bringing into question constitutional rights and privileges. While law enforcement officers may find their duties more arduous and crime detection more difficult as society becomes more complicated, the constitutional safeguards of the

---

by the Act of June 30, 1864, 13 Stat. 202, 217–18 (invoice must be made out in the weights and measures of the country from which importation made); as amended by the Act of July 18, 1866, 14 Stat. 178, 187 (seizure of invoices); as amended by the Act of March 2, 1867, 14 Stat. 546, 547 (seizure of invoices); as amended by the Act of June 22, 1874, 18 Stat. 186, 187 (§ 5—seizure of invoices—held unconstitutional in *Boyd* case). For administrative requirements as to form, contents, filing and keeping of invoices, in effect at time of entry involved in *Boyd* case, see General Regulations under the Customs and Navigation Laws (1884) Arts. 314–34; see also Elmes, Customs (1887) c. VII.

individual were not designed for short-cuts in the administration of criminal justice.

And so I conclude that the Court has misconstrued the Fifth Amendment by narrowing the range and scope of the protection it was intended to afford. The privilege against self-incrimination is, after all, "as broad as the mischief against which it seeks to guard." *Counselman* v. *Hitchcock, supra,* at p. 562. If Congress by the easy device of requiring a man to keep the private papers that he has customarily kept can render such papers "public" and non-privileged, there is little left to either the right of privacy or the constitutional privilege.

Even if there were authority for the temerarious pronouncement in today's opinion, I would insist that such authority was ill-founded and ought not to be followed. There is no such authority. The Court's opinion can gain no strength beyond itself. The persuasiveness of its opinion is not enhanced by the endeavor of the majority of the Court, so needlessly reaching out for a constitutional issue, to rest its ominous inroads upon the Fifth Amendment not on the wisdom of their determination but on blind reliance upon non-persuasive authority.

MR. JUSTICE JACKSON, with whom MR. JUSTICE MURPHY agrees, dissenting.

The protection against compulsory self-incrimination, guaranteed by the Fifth Amendment, is nullified to whatever extent this Court holds that Congress may require a citizen to keep an account of his deeds and misdeeds and turn over or exhibit the record on demand of government inspectors, who then can use it to convict him. Today's decision introduces a principle of considerable moment. Of course, it strips of protection only business men and their records; but we cannot too often remind ourselves of the tendency of such a principle, once approved, to expand itself in practice "to the limits of its logic." That it has already expanded to cover a vast

area is apparent from the Court's citation of twenty-six federal statutes that present parallels to the situation here under review. It would, no doubt, simplify enforcement of all criminal laws if each citizen were required to keep a diary that would show where he was at all times, with whom he was, and what he was up to. The decision of today, applying this rule not merely to records specially required under the Act but also to records "customarily kept," invites and facilitates that eventuality.

The practice approved today obviously narrows the protections of the Fifth Amendment. We should not attribute to Congress such a purpose or intent unless it used language so mandatory and unmistakable that it left no alternative, and certainly should not base that inference on "legislative history" of such dubious meaning as exists in this case. Congress, if we give its language plain and usual meaning, has guarded the immunity so scrupulously as to raise no constitutional question. But if Congress had overstepped, we should have no hesitation in holding that the Government must lose some cases rather than the people lose their immunities from compulsory self-incrimination. However, in this case, the plain language of Congress requires no such choice. It does require, in my view, that this judgment be reversed.

MR. JUSTICE RUTLEDGE, dissenting.

With reservations to be noted, I agree with the views expressed by MR. JUSTICE JACKSON, and with MR. JUSTICE FRANKFURTER's conclusions concerning the effect of the immunity provision, § 202 (g) of the Emergency Price Control Act.[1]

---

[1] 56 Stat. 23, 30 [§ 202 (g)], as amended, 50 U. S. C. App. § 901, incorporating the provisions of the Compulsory Testimony Act of 1893, 27 Stat. 443, 49 U. S. C. § 46, quoted in the Court's opinion in note 2.

With them I cannot accept the Court's construction of that section which reduces the statutory immunity to the scope of that afforded by the Fifth Amendment's prohibition against compulsory self-incrimination. This Court has not previously so decided.[2] Nor, in my judg-

---

[2] Neither *Heike* v. *United States,* 227 U. S. 131, nor *Wilson* v. *United States,* 221 U. S. 361, principally relied upon by the Court, approached such a ruling.

The *Wilson* case dealt only with corporate records, and the claim of a corporate officer having their custody to constitutional immunity against being required to produce them. None were required by law to be kept, in the sense that any federal law required that they be kept and produced for regulatory purposes. The only ruling was that a corporate officer has no personal immunity against producing corporate records, which are of course not his own, and that the corporation has no immunity of its own under the Fifth Amendment's guaranty. The decision is not pertinent to the presently tendered problem.

The *Heike* decision is equally not apropos. The exact ruling was that the evidence, from the production of which the claimed right of immunity, constitutional as well as statutory, arose, "did not concern any matter of the present charge. Not only was the general subject of the former investigation wholly different, but the specific things testified to had no connection with the facts now in proof much closer than that they all were dealings of the same sugar company." 227 U. S. 131, 143. The actual ruling therefore, apart from the fact that a corporate officer claimed immunity in large part for producing corporate records, see *id.,* 142–143, was that the petitioner had not brought himself within the scope of the statutory authorization, namely, because the "transaction, matter or thing" concerning which he had testified had no substantial connection with the matters involved in his prosecution. The decision is authority for nothing more than that the immunity at the most does not attach when the constitutional claim precluded, but said to bring the statute into play, is insubstantial. The dictum stressed in the Court's opinion that the statute "should be construed, *so far as its words fairly allow the construction,* as coterminous with" (P. 142) the constitutional immunity, not only was unnecessary, but as the clause itself emphasized explicitly negatives exact equivalence. (Emphasis added.)

ment, can the present decision be reconciled with the language of the statute or its purpose obvious on its face.

That wording compels testimony and the production of evidence, documentary or otherwise, regardless of any claim of constitutional immunity, whether valid or not.[3] But to avoid the constitutional prohibition and, it would seem clearly, also any delay in securing the information or evidence required, the Act promises immunity "for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence . . . in obedience to" the subpoena.[4]

The statute thus consists of a command and a promise. In explicit terms the promise is made coextensive with the command. It expressly precludes prosecution, forfeiture or penalty "for or on account of *any* transaction, matter or thing" concerning which evidence is produced in compliance with the subpoena.[5] Compelling testimony and giving immunity "for or on account of any transaction, matter or thing, concerning which he may testify" are very different from compelling it and promising that, when given, the person complying "shall have only the immunity given by the Fifth Amendment and no more." To constrict the statute's wording so drastically is not simply to interpret, it is to rewrite the congressional

---

[3] The wording of the Compulsory Testimony Act neither requires nor suggests that the right to the immunity given should turn on the validity or invalidity of the constitutional claim which is precluded. But at the least the Act would seem clearly to cover both valid and substantially doubtful ones.

[4] See the text of the Compulsory Testimony Act of 1893 quoted in note 2 of the Court's opinion.

[5] The express limitation of the immunity to testimony or evidence produced in obedience to the subpoena excludes immunity for volunteered testimony or evidence, *i. e.*, such as is given in excess of the subpoena's requirement. But the terms of the statute purport to exclude no other.

language and, in my view, its purpose. If Congress had intended only so narrow a protection, it could easily have said so without adding words to lead witnesses and others to believe more was given.

It may be, however, notwithstanding the breadth of the promissory terms, that the statutory immunity was not intended to be so broad as to cover situations where the claim of constitutional right precluded is only frivolous or insubstantial or not put forward in good faith.[6] And if, for such a reason, the literal breadth of the wording may be somewhat cut down, restricting the statute's immunity by excluding those situations would neither restrict the effect of the statutory words to that of the Amendment itself nor give them the misleading connotation of the Court's construction. Such a construction would not be departing widely from either the statute's terms or their obvious purpose to give immunity broader than the Amendment's, and would be well within the bounds of statutory interpretation. On the other hand, the Court's reduction of the statutory wording to equivalence in effect with the constitutional immunity, nearly if not quite makes that wording redundant or meaningless; in any event, it goes so far in rewriting the statutory language as to amount to invasion of the legislative function.

Whether one or the other of the two broader views of the statute's effect is accepted, therefore, it is neither necessary nor, I think, reasonable or consistent with the statutory wording and object or with this Court's function as strictly a judicial body to go so far in reconstructing what Congress has done, as I think results from reducing the statutory immunity to equivalence with the constitutional one.

---

[6] Cf. *Heike* v. *United States*, 227 U. S. 131. See note 2 *supra*.

Since it is not contended that there was not full compliance with the subpoena in this case, that compliance was excessive in the presently material portions of the evidence or information produced, or that the claim of constitutional immunity precluded was frivolous, insubstantial or not made in good faith, I think the judgment should be reversed by applying the statutory immunity, whether in one or the other of the two forms which may be applied.

In this view I am relieved of the necessity of reaching the constitutional issue resulting from the Court's construction, and I express no opinion upon it except to say that I have substantial doubt of the validity of the Court's conclusion and indicate some of the reasons for this.  I have none that Congress itself may require the keeping and production of specified records, with appropriate limitations, in connection with business matters it is entitled to and does regulate.   That is true not only of corporate records, *Wilson* v. *United States,* 221 U. S. 361, but also of individual business records under appropriate specification and limitations, as the numerous instances cited in MR. JUSTICE FRANKFURTER's opinion illustrate.

But I seriously doubt that, consistently with the Fourth Amendment, as well as the prohibition of the Fifth against compulsory self-incrimination, Congress could enact a general law requiring all persons, individual or corporate, engaged in business subject to congressional regulation to produce, either in evidence or for an administrative agency's or official's examination, any and all records, without other limitation, kept in connection with that business.   Such a command would approach too closely in effect the kind of general warrant the Fourth Amendment outlawed.   That would be even more obviously true, if there were any difference, in case Congress

should delegate to an administrative or executive official the power to impose so broad a prohibition.

The authority here conferred upon the Administrator by the Emergency Price Control Act, in reference to record-keeping and requiring production of records, closely approaches such a command. Congress neither itself specifies the records to be kept and produced upon the Administrator's demand nor limits his power to designate them by any restriction other than that he may require such as "he deems necessary or proper to assist him," § 202 (a), (b), (c), in carrying out his functions of investigation and prescribing regulations under, as well as of administration and enforcement of, the Act. And as the authority to specify records for keeping and production was carried out by the Administrator, the only limitation imposed was that the records should be such as had been "customarily kept." § 14 (b), M. P. R. 426, 8 Fed. Reg. 9546, 9549. Such a restriction is little, if any, less broad than the one concerning which I have indicated doubt that Congress itself could enact consistently with the Fourth Amendment.

The authorization therefore is one which raises serious question whether, by reason of failure to make more definite specification of the records to be kept and produced, the legislation and regulations involved here do not exceed the prohibition of the Fourth Amendment against general warrants and unreasonable searches and seizures. There is a difference, of course, and often a large one, between situations where evidence is searched out and seized without warrant, and others where it is required to be produced under judicial safeguards. But I do not understand that in the latter situation its production can be required under a warrant that amounts to a general one. The Fourth Amendment stands as a barrier to judicial and legislative as well as executive or administrative excesses in this respect.

Although I seriously question whether the sum of the statute, as construed by the Court, the pertinent regulations, and their execution in this case does not go beyond constitutional limitations in the breadth of their inquiry, I express no conclusive opinion concerning this, since for me the statutory immunity applies and is sufficient to require reversal of petitioner's conviction.